**AMERICAN STATE BANK & TRUST CO. v. JOHNSTON et al.**

No. 9027.

Court of Civil Appeals of Texas. San Antonio.

March 15, 1933.

Rehearing Denied April 12, 1933.

Montgomery, Hall & Taylor, of Edinburg, and West & Hightower, of Brownsville, for appellant.

Brown & Bader, of Edinburg, and Robert E. Kirkpatrick, of Mercedes, for appellees.

SMITH, Justice.

On December 12, 1918, Fred L. Johnston and wife, Francisca Hinajosa Johnston, executed their promissory note for the sum of $8,000, payable to A. D. Struthers, and to secure the payment of same executed their deed of trust upon 677.16 acres of land in the Wells Ranch, and 363 acres in the Panchita Ranch, all in Hidalgo county. In said deed of trust the grantors designated two certain lots in the city of Mercedes as their homestead, and expressly represented that the mortgaged premises constituted no part of their homestead. This note and deed of trust were transferred by Struthers to the First National Bank of Lyford, which in turn transferred them to the Western Life Insurance Company.

On March 31, 1923, the Johnstons executed a new note, for $12,000, to the Western Life Insurance Company, renewed the deed of trust upon the same land, with the same homestead designation and representation, and on October 1, 1924, executed to said insurance company a new note, for $15,000, secured in like manner, but omitting any homestead designation. On May 2, 1925, the payee assigned said note and deed of trust to the Royal Union Life Insurance Company, which on August 30, 1926, assigned them to Wimer-Richardson & Company, which in turn on December 13, 1927, assigned them to the Edinburg State Bank & Trust Company.

On November 16, 1928, the Johnstons executed new notes for $10,238.32, $15,562.50, and $1,347.93, respectively, to the Edinburg State Bank & Trust Company, and secured the same by a renewal of the existing deed of trust, in which it was declared that the property formed no part of the grantors' homestead and was not exempt from forced sale, and on March 22, 1930, executed a consolidated renewal note to said bank and trust company for $26,497, and secured the same by a renewed deed of trust. Said bank and trust company assigned the note and deed of trust to American State Bank & Trust Company on October 18, 1930.

On December 2, 1930, the land was sold under the provisions of the deed of trust by a substitute trustee, and was bought in by the cestui que trust, American State Bank & Trust Company, which afterwards brought

this action in trespass to try title against the Johnstons to recover title and possession of all of said lands.

The Johnstons disclaimed as to all of said lands except a specifically described 200 acres of the tract conveyed out of the Panchita Ranch, which they claimed was their homestead, and had been all the while. Upon a jury trial the court rendered judgment in favor of the Johnstons' claim of homestead exemption, and the bank and trust company has appealed.

The case is a very difficult one. Upon one hand, its determination may result in the perpetration of a fraud upon good faith creditors, under the cloak of the homestead exemption afforded by the Constitution (article 16, § 50); whereas, on the other hand, its determination may conceivably effectuate a fraud upon that exemption.

The Panchita Ranch seems to have belonged to the ancestors of Francisca Hinajosa Johnston, and when the latter married Fred L. Johnston, in 1896, the young couple set up their home on that ranch, and have maintained it as their homestead ever since, unless they effectually abandoned it as such by reason of the transactions involved in this suit. At the time they moved onto the ranch a small "dug well," "two or three small fields" (about 12 acres in all), and "a few little jacals" constituted the improvements thereon. A "jacal is a thatched-roof house, with wooden walls—walls made out of mud and timber." The young couple made their home in the jacals. They cleared more land, put in two more wells and a windmill, and built a larger jacal, in which their three children were born. Later, apparently in 1909, they built a more pretentious frame house, but it was destroyed by fire in 1916, and they were relegated to the jacals, which still suffice as their dwelling place.

In the meantime, in 1906, appellees purchased two residence lots in the town of Mercedes, a few miles from the ranch, and in 1909 built a five-room dwelling house thereon, which they completely furnished and equipped as a home, and still maintain as such. The record does not seem to show when the family first began to make their residence in this house, but does show that they lived therein during the school term beginning in 1915, and through every school year thereafter. Mr. Johnston spent most of his time on the ranch, and Mrs. Johnston and the children spent the week-ends, in good weather, and the time between school terms, at the ranch. For several months in the early part of the year in which the original deed of trust was executed, Johnston had worked for the federal government as labor foreman in a camp at Mercedes, but otherwise spent most of his time at the ranch, where he was engaged in farming and stock-raising. Such was the situation in which appellees executed the first deed of trust in which they represented that the ranch property covered by the deed of trust lien constituted no part of their homestead, and in which they designated the Mercedes property as their homestead.

Struthers, appellees' creditor and the beneficiary of the deed of trust lien, was fully aware of all the facts recited above; he knew the general fact that appellees maintained the two residences, that they resided in the Mercedes place during the nine months of each year while their children were in school, and the remainder of the time in the ranch house. Struthers was often at both places, to confer with Johnston; going in search of the latter and not finding him at the ranch, he would find him at the Mercedes place, and vice versa. Their relations were apparently very close, at least in a business way, as Struthers appears to have financed all Johnston's operations. In this way the latter became indebted to the former in the sum of $8,000, and when Struthers pressed appellees for some sort of settlement the latter executed their note for the amount of the debt, and thereupon, apparently reluctantly, but none the less expressly, elected in said deed of trust between the Mercedes and ranch residences and in such election designated the former their homestead, and expressly represented that the mortgaged premises constituted no part of their homestead. The evidence seems to show that the designated property was of greater value than the ranch home. And the evidence further shows that thereafter appellees repeatedly mortgaged the ranch place to secure the increasing debt, leaving the designated homestead free of incumbrance.

So, when in 1923 the first note matured, and appellees had been wiped out by flood and storm, Struthers advanced them $3,000 in cash to tide them over the resulting depression, taking their note to cover renewal of the old debt, and the new as well, securing it by renewal of the deed of trust, which carried a reiteration of the designation of the Mercedes property as the homestead.

It is established by the record that in each instance appellees were loth to designate the Mercedes place as their homestead, and repudiate the ranch as such homestead, and appellees stress this fact in support of their claim that that designation was ineffectual and not binding upon them. We think, however, that such reluctance emphasizes rather than weakens the force of that designation, for it shows appellees surely realized the force and solemn effect of their act of designation. They do not defend the suit upon the ground that they elected under duress or that they were deceived into it; they negative such defenses by asserting that they so elected deliberately, albeit with much reluctance. It may have been, no doubt was

indeed, a grave choice, a solemn election, but it was deliberately exercised with full realization of its effect.

We are therefore relegated to the controlling question: Do the facts present a situation of ambiguity in which appellees could rationally and reasonably say and maintain that the Mercedes place, or the ranch property, either, was their homestead? Was their relation to both in everyday life such that they could reasonably say either was their homestead? If so, then their election of the one, being specific and deliberate, was binding upon them, and left them free to execute a valid and enforceable mortgage upon the other. Parrish v. Hawes, 95 Tex. 185, 66 S. W. 209, 211; Carstens v. Landrum (Tex. Com. App.) 17 S.W.(2d) 803.

We have concluded, after some hesitation in deference to the rulings of the trial court, that appellees are bound by their election, and are now estopped to claim the ranch property as their homestead in the face of the deliberate election of the town property for that purpose, since the evidence shows indubitably that prior to and at the time of and subsequent to their election they did in fact put the town property to the ordinary uses of a homestead; the family actually residing therein, day and night, more than half the time. It was a more valuable place than the ranch home, the latter apparently a mere shack. It was better furnished as a home, was equipped with all modern city improvements, such as gas, lights, water, sanitary fixtures and facilities, whereas, the ranch property had none of these conveniences.

It is true the family spent all their summers at the ranch house, and many of their week-ends there at other times; most of Mr. Johnston's activities were on the ranch, although not all of them, by any means, for, in addition to his farm and stock operations on the ranch, he conducted some sort of real estate commission business, which he advertised on a large signboard set up in the front yard of the town house, directing all interested to "inquire within." From all the facts stated it does seem obvious that appellees could claim and enforce the homestead exemption upon either the town or the ranch place. Surely, after they elected and designated the town property as their homestead in the manner shown, they could have claimed and enforced the exemption thereon against all the world, under the facts disclosed in this record. The language of Judge Williams in the case first cited above seems precisely applicable here when he said:

"It may happen that families, the heads of which own more than one place suitable for a residence, will reside sometimes upon one and sometimes upon another, in such way that either serves to meet all the purposes of the home. No question of exemption or of power to mortgage or alienate may have ever arisen to make it necessary for them to select the place which will be claimed and held as the home. Upon this state of facts alone, no court could say, as matter of law, which one of the places thus used constitutes the homestead to which the constitutional protection is given; nor could persons dealing with the owner of the property. To determine the question thus arising, something more than mere use would have to appear. In such cases we see no reason why the husband and wife, if not the husband alone, would not have the absolute right, when occasion arises, to determine by selection the place to be held and protected as the homestead; nor why, after having selected and designated one of the places, and mortgaged another to a lender acting upon the faith of the selection, they should not be estopped, as to him, from claiming the mortgaged property as exempt.

"Under this view, the provisions of the mortgage and the statements in the other paper, called the 'designation,' would amount to such an election,—nothing having been previously done to impress definitely upon the Live Oak street property exclusively the homestead character,—and these facts thus present a question of estoppel. Or, if it were held that, the use of both places being sufficient for homestead purposes, the mere intention of the owners to hold the one or the other as their homestead would give it character as such, an estoppel might arise from their misrepresentation of their intent. The intention could only be definitely known to and disclosed by themselves; and, if facts had not transpired which certainly made one of the places their homestead under the law, persons dealing with them would naturally rely and act upon their statements as to its existence in such way as to estop them from afterwards disputing the truth of the representations made." Parrish v. Hawes, supra.

Appellees rely largely upon the decision of this court in City Central Bank v. Byrne, 47 S.W.(2d) 432. But the situation of the family in that case was quite different, for there the place designated as the homestead was not in any sort of use for that purpose, was unfurnished, dismantled, and uninhabitable, and the family were actually residing in their farm home, where they had resided ever since marriage, except for necessary short intervals while the children were in school at Tilden, Wentz, or Three Rivers. There the use of the ranch home was exclusive except during the intervals mentioned; in this case ever since 1915 the family have spent most of the time in the Mercedes residence, which they furnished comfortably and equipped fully with all the comforts of a modern home. The family's occupancy and use of neither the ranch home nor the town home has been exclusive, but has been indiscriminate, rather, so that until they chose to elect between the two they could invoke the homestead ex-

emption upon either with equal reason and effect. But under the authorities cited they can claim but one exemption, and when they elected and designated the Mercedes home and declared they claimed no exemption upon the other, and by that conduct obtained an advantage over their creditor, they are estopped to repudiate that election or dispute the truth of their representation. And when appellees obtained renewed and increasing credit upon the same or reiterated designations and representations, and the situations of the parties remained substantially the same, we see no reason why their original liability should not be extended along with the debt and lien. The foregoing conclusions seem to settle the appeal, requiring reversal.

Appellant has raised numerous related or incidental questions, but as they should and probably will be obviated upon another trial, we see no occasion to prolong this opinion, already too long, in order to discuss them. It should be said, however, that we sustain, in the abstract, the contentions made by appellant in his propositions 1, 2, 5, 6, 7, 8, 9. The application of those contentions in this case must, of course, depend upon the evidence upon another trial. We conclude that these holdings have the effect of overruling appellees' cross-assignments of error, and it is so ordered.

The judgment is reversed, and the cause remanded.