**In re Albert Vaughan MITCHELL, Debtor.**

**Bankruptcy No. 87–60229–C–13.**

United States Bankruptcy Court,
W.D. Texas,
Waco Division.

Nov. 30, 1987.

Randy Roberts, Black & Roberts, Dallas, Tex., for debtor.

Edwin R. DeYoung, William B. Mateja, Dallas, Tex., for Commerce Bank–Las Colinas.

## MEMORANDUM OPINION

LEIF M. CLARK, Bankruptcy Judge.

Albert Vaughan Mitchell was in the real estate business. He executed a guaranty to Texas Commerce Bank–Las Colinas (TCB) on one of his real estate transactions. The reverses suffered by so many in the real estate business in Texas did not spare Mr. Mitchell, who lost his business,

his wife, and even his home. He also lost a lawsuit brought by TCB on his guaranty. As a result, in November 1985, a judicial lien attached to some rural real estate in Hillsboro, Texas owned by Mr. Mitchell ("the Hillsboro property"). This land, consisting of two parcels totalling approximately 230 acres, has been in the Mitchell family since just after the turn of the century. Mitchell's parents still live on the land, though, in 1979, they sold fee simple title to their son on the eve of foreclosure by the first lienholder, evidently to save the farm.[1] Mr. Mitchell still makes the payments on the farm and goes there frequently on weekends and sometimes during the week (in the summertime). After he lost his home in Dallas, he moved some of his clothing and furniture to the Hillsboro property (he had nowhere else to store them). Neither of Mitchell's parents actually farm the property, nor is Mitchell a farmer. Instead, the land is leased to another farmer, who pays rent in the form of a percentage of his harvest proceeds. Mitchell occasionally "helps out" with the farming, making fence repairs and the like.

In November 1986, Mr. Mitchell remarried. His new wife lived in Garland, Texas ("the Garland property"). Mr. Mitchell had met her in the spring of 1985 and, after he lost his home to foreclosure, he took up residence with her. He kept most of his work clothes at her home and commuted daily to Dallas, where he works as a workout consultant to a Dallas savings and loan company. He assumed the duties of father to her two children (by a previous marriage). During the summer, they would take the children down to Hillsboro for upwards of a week at a time. During the school year, Mitchell and his wife would get away to Hillsboro on weekends, especially when the children were with their father (Myra's first husband).

In March 1987, Mitchell filed this chapter 13 case, claiming the Hillsboro property as exempt on his informational schedule. TCB did not object to the exemption claim within 30 days of the § 341 meeting, as prescribed by Bankruptcy Rule 4003(b). The debtor proposed a plan which contemplated avoiding TCB's judicial lien on the Hillsboro property and, incident to the plan, filed a motion under Section 522(f) to avoid the lien. TCB objected to the lien avoidance as well as to the plan, on grounds that the Hillsboro property was not exempt as Mitchell's homestead. In a prophylactic manuever, TCB also filed a late objection to the homestead exemption claim itself. Mitchell strenuously objected to TCB's right to raise the validity of the exemption in the lien avoidance action, contending that TCB was estopped because it had failed to object to the exemption claims within thirty days after the first meeting of creditors, as prescribed by Bankruptcy Rule 4003. He also contended that the Hillsboro property was eligible for exemption anyway so the lien avoidance should be permitted and the plan confirmed.

The parties agree that this court's disposition of the lien avoidance issue effectively decides the confirmation issue as well, as the plan cannot otherwise succeed. The parties thus proceeded to put on confirmation evidence as well, so that, in the event this court's decision regarding the lien avoidance should be overturned on appeal, the parties would not need to retry the case. After consideration of the evidence, the court has, for the reasons set out in this opinion, concluded that (1) the creditor was not estopped from contesting the validity of the exemption as a defense to the lien avoidance action, (2) the Hillsboro property is not eligible for exemption under Section 522(b), and therefore TCB's lien cannot be avoided under Section 522(f), and that, as a result, (3) the plan cannot be confirmed.[2]

---

1. Had Mitchell simply cured the arrearages and assumed the payments to the lienholder, without taking title from his parents, the property would have remained his parents' homestead, TCB's lien would never have attached to the property, and this litigation would never have arisen. His parents would still live on the land,

as they do now, and he and his wife would continue to go there on occasion, as they do now. It is not at all clear why Mitchell felt it necessary to take title to the property in 1979 in the first place.

2. TCB did not otherwise object to confirmation of the plan. This court, while it questions the

## DISCUSSION

### I. DOES THE CREDITOR'S FAILURE TO OBJECT TO DEBTOR'S EXEMPTIONS WITHIN THIRTY DAYS AFTER THE § 341 MEETING OPERATE AS AN ESTOPPEL TO PREVENT CREDITOR FROM RAISING THE EXEMPTION ISSUE IN THE DEBTOR'S LIEN AVOIDANCE ACTION UNDER § 522(f)?

■ The debtor contends that TCB's failure to object to the debtor's exemptions within thirty days after the § 341 meeting should prevent TCB from attacking the claimed exemption in this lien avoidance action. As a general proposition, the debtor's position has support. *In re Hahn*, 60 B.R. 69, 75–76 (Bankr.D.Minn.1985); *but see In re Rollins*, 63 B.R. 780, 783 (Bankr. E.D.Tenn.1986). A wooden application of the *Hahn* rule, however, yields results inconsistent with the equitable principles which underpin estoppel. *Hahn* also does not grapple with the express language of Section 522(f). A closer analysis of Section 522(f), the function of exemptions in chapter 13 cases, and the nature of estoppel itself lead this court to conclude that a failure by a judicial lien creditor to object to exemption claims within the time frame set out in Bankruptcy Rule 4003(b) will not prevent that creditor from asserting the invalidity of the lien under Section 522(b) as a defense to the debtor's lien avoidance action.

### A. *The nature of a lien avoidance action under § 522(f)*

The natural place to begin this analysis is with the statute itself.

Section 522(f) provides in pertinent part as follows:

> ... the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption *to which the debtor would have been entitled under subsection (b) of this section,* if such lien is—

(1) a judicial lien;

.   .   .   .   .

11 U.S.C.S. § 522(f)(1) (Norton pamphl.ed. 1987) (emphasis added). The avoidance power is an extraordinary device implemented by Congress in the 1978 Code to enhance the debtor's fresh start. It permits a debtor to select an exemption *ex post facto,* then to eliminate an otherwise valid judicial lien impairing that exemption. Commented the House Report:

> ... The ... right [to avoid judicial liens] allows the debtor to undo the actions of creditors that bring legal action against the debtor shortly before bankruptcy. Bankruptcy exists to provide relief for an overburdened debtor. If a creditor beats the debtor into court, the debtor is nevertheless entitled to his exemptions.

H.Rep. No. 95–595 at p. 126, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6087. The Report also acknowledged the balance to be struck between the debtor's fresh start and existing state law exemption schemes:

> H.R. 8200 [the precursor to the Bankruptcy Reform Act of 1978] adopts the position that there is a Federal interest in seeing that a debtor that goes through bankruptcy comes out with adequate possessions to begin his fresh start. Recognizing however that circumstances do vary in different parts of the country, the bill permits *the States to set exemption levels appropriate to the locale,* and allows the debtor to choose between the State exemptions and the Federal exemptions provided in the bill. Thus, the bill continues to recognize the States' interest in regulating credit within the States, but enunciates a bankruptcy policy that favors a fresh start.

*Id.* The policy of the Code then is to afford the debtor the maximum benefit of those exemptions to the extent they are otherwise authorized under whichever exemption scheme the debtor elects. Consistent with this policy, Section 522(f) authorizes avoidance of liens to facilitate the debtor's

---

choice of forum (the debtor lives in Dallas), and notes that TCB appears to be the sole motivation (dare we say target?) of the debtor's plan, can-

not find that the plan has not been proposed in good faith. *See In re Easeley,* 72 B.R. 948 (Bankr.M.D.Tenn.1987).

fresh start, but limits the availability of the avoidance powers to those exemptions *"to which the debtor would have been entitled under subsection (b) of this section* [Section 522]." 11 U.S.C. § 522(f) (Norton pamphl.ed. 1987). Thus, one element of the debtor's cause of action under Section 522(f) is that the subject property is otherwise exempt under Section 522(b). *In re Shands,* 57 B.R. 49, 50 (Bankr.D.S.C.1985). If the debtor has elected the state exemption scheme (and he or she must make an election under Section 522(b)), then the debtor must establish that, under applicable state law, the subject property would be exempt. *Matter of Allen,* 725 F.2d 290, 292–93 (5th Cir.1984).[3]

The debtor's estoppel argument is premised on the concept that, even though a particular exemption might not be cognizable under Section 522(b), if the creditor has not timely objected under Bankruptcy Rule 4003(b) to the debtor's claiming the exemption, the property is deemed exempt under Section 522(*l*). The exemption, goes the argument, is therefore immune from further attack in a later lien avoidance action.

Section 522(*l*) provides that:

The debtor shall file a list of property that the debtor *claims* as exempt under subsection (b) of this section.... Unless a party in interest objects, the property *claimed as exempt on such list* is exempt.

11 U.S.C. § 522(*l*) (Norton pamphl. ed. 1987) (emphasis added). Bankruptcy Rule 4003(b) was written to implement Section 522(*l*). *In re Starns,* 52 B.R. 405, 410 (S.D.Tex.1985). It reads as follows:

The trustee or any creditor may file objections to the list of property claimed as exempt within 30 days after the conclusion of the meeting of creditors held pursuant to Rule 2003(a) or the filing of any amendment to the list unless, within such period, further time is granted by the court....

Rule 4003(b), Bankruptcy Rules (Norton pamphl. ed. 1987) (emphasis added). Thus, an otherwise nonexempt item of property is deemed exempt under Section 522(*l*) if no one objected within the time frame established by Bankruptcy Rule 4003(b). As a result, the debtor's entitlement to the exemption is invulnerable to later attack. *See In re Payton,* 73 B.R. 31, 31 (Bankr.W. D.Tex.1987).

A lien avoidance action, however, does not place in issue the debtor's *entitlement* to the exemption so claimed. It focuses instead on entitlement to the special remedy set out in Section 522(f). A determination under that section that the property is ineligible for *lien avoidance* does not mean that the property is then ineligible for *exemption.* The debtor's entitlement to the exemption remains undisturbed regardless of the outcome of the lien avoidance action.[4]

Section 522(f) by its terms restricts the availability of lien avoidance to property *otherwise exempt under Section 522(b).* An exemption which the debtor acquires solely by default pursuant to Section 522(*l*) is *not* necessarily "an exemption to which the debtor would have been entitled under subsection (b) of this section [Section 522]." 11 U.S.C. § 522(f) (Norton pamphl. ed. 1987). Section 522(*l*) may not therefore be used by the debtor as a substitute to satis-

---

**3.** Section 522(f) merely gives the debtor the power to avoid a lien on property to the extent that the lien impairs an exemption to which the debtor would have been entitled under § 522(b) ... Therefore, one must look to § 522(b) to determine the exemptions. *Id.* In *Allen,* the Fifth Circuit noted that property subject to a consensual lien is, by definition, not exempt under the Texas exemption statutes. Therefore, if the debtor elected the Texas exemptions, the property there in question "would not be 522(b) exempt property and would not be exempt under the section (f) savings clause." *Id.* When the Fifth Circuit next visited the issue, it upheld its prior decision in *Allen.*

Though it questioned *Allen's* interpretation of Texas law, it left undisturbed its analysis of Section 522(f). *Matter of Bessent,* 831 F.2d 82, 83 n. 3 (5th Cir.1987).

**4.** Subsection (f) of Section 522 makes no reference to subsection (*l*). Neither does subsection (b). By the same token, subsection (*l*) does not purport by its terms to qualify property deemed exempt as "522(b)" exempt property. Subsections (f) and (b) on the one hand, and subsection (*l*) on the other, function independently of one another.

fy the Section 522(b) eligibility element of a lien avoidance action.

This interpretation of Section 522(f) is consistent with the operation of Section 522 as a whole. Section 522(b) defines those exemptions to which the debtor is *in fact* entitled. These are the exemptions which, consistent with the legislative history, are worthy of the extraordinary protection of Section 522(f). Section 522(*l*) serves an entirely different function, that of promptly liberating property the debtor wishes to keep for his "fresh start" from the continuing administration of the bankruptcy court. *In re Novotny*, 17 Bankr. 196, 198 (Bankr. D.S.D.1982) ("any delay in a determination of exemptions only hinders a debtor's fresh start"). Once the debtor has his exempt property back, that policy has been satisfied. Lien avoidance actions can then be initiated in the debtor's own good time. *In re Quackenbos*, 71 B.R. 693, 695 (Bankr.E. D.Pa.1987) (citing numerous authorities for the proposition that a case may even be reopened many months later solely to permit the debtor to avoid a lien under Section 522(f)). That the property might not be eligible for lien avoidance (because it does not qualify under Section 522(b)) certainly hinders the debtor's fresh start, but only because there are congressional limits on the fresh start to which the debtor is entitled built into Section 522(f). The enunciated policy of prompt determination is unaffected by the fact that the debtor who later

wants to avoid a creditor's lien may not be able to get past Section 522(b).[5]

It is also entirely appropriate that a debtor about to eliminate another's property rights be put to his or her proof, and not be permitted to rely on a technical estoppel which is at best only tangentially related to the lien avoidance issue in any event. This is so for two reasons. First, the express language of the statute directs the court not to what has been *deemed* exempt but rather to what *would be exempt* under Section 522(b). It is to Section 522(b), not to Section 522(*l*), that the court's attention must be directed in Section 522(f) actions. *Matter of Allen*, 725 F.2d 290, 292–93 (5th Cir.1984).[6] Second, requiring secured creditors to object to exemptions in order to preserve defenses to a potential lien avoidance action that may never be brought tends to multiply litigation. In fact, such a rule actually frustrates the prompt determination policy which underlies Section 522(*l*). The lien avoidance exception would swallow up the fresh start rule as the debtor's unfettered use of his or her claimed exemptions is delayed by prophylactic litigation that might never have been brought were the creditor permitted to hold his defenses until such time as a lien avoidance action is initiated.[7] Thus, sound policy dictates that the debtor not be permitted to interpose Section 522(*l*) to prevent a creditor's raising invalidity of claimed

---

**5.** In a very real sense, it might be said that there are *two* independent schemes for assisting the debtor in achieving his fresh start *vis-a-vis* exemptions. The first, typified by Section 522(*l*), is aimed principally at freeing select assets from the general creditor body. The second, more restricted in scope and typified by Section 522(f), aims at liberating certain assets from certain kinds of secured creditors. Secured creditors have little justification for interfering in what assets are available to satisfy unsecured claims, so long as the secured creditors have their liens. Unsecured creditors have little interest in whether a secured creditor is able to enforce his lien against property already beyond the reach of the unsecured creditors by virtue of Section 522(*l*). The rule announced by the court in this decision is consistent with this concept.

**6.** Section 522(f), a statute in derogation of ordinary principles of private rights, especially

property rights, must be subjected to strict construction. *Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 241–42, 4 L.Ed. 559, 561 (1819); *United States v. De la Maza Arredondo*, 31 U.S. (6 Pet.) 691, 733, 8 L.Ed. 547, 563 (1832). It is thus appropriate to read the language of Section 522(f) narrowly, and to construe its tenor strictly.

**7.** In some cases a debtor would be better off if the creditor were *not* required to object in order to preserve its defenses. For example, were a secured creditor with a small judicial lien on, say, a debtor's farm (in which the debtor has substantial equity) to successfully object to the claimed exemption, the debtor would lose the *entire property including the equity over the judicial lien*. If the creditor did not object, and no one else did either, the debtor would have the benefit of the equity in excess of the small judicial lien *even if he or she lost the lien avoidance action*.

exemptions as a defense to a lien avoidance action.

### B. *The purpose of Bankruptcy Rule 4003*

Bankruptcy Rule 4003 was enacted to implement Section 522(*l*). Bankruptcy Rule 4003, Advisory Committee Note (1983), *Norton Bankr. Law & Prac.* (1987). The rule and the Code section, operating together accomplish the function of removing the property from estate administration and returning the property to the debtor. *In re Allen,* 44 B.R. 38, 40 (Bankr.D.N.M. 1984). As the purpose of Section 522(*l*) is not frustrated by creditor's contesting a debtor's entitlement to exemption in a lien avoidance action, neither is the function of Bankruptcy Rule 4003(b) undermined.

Bankruptcy Rule 4003(b) has considerably less vitality in a chapter 13 proceeding, in any event. It has been said that the only real function of listing exemptions in chapter 13 is to permit a liquidation analysis under Section 1325(a)(4). *Grenco Real Estate Investment Trust v. Morris (In re Morris),* 48 B.R. 313, 314 (W.D.Va.1985); *Slykerman v. Associates Financial Services,* 29 B.R. 82 (Bankr.E.D.Mich.1983); *see* discussion *infra. See also In re Summerlin,* 26 B.R. 875, 878 (Bankr.E.D.N.C. 1983) (because all of a debtor's property vests in the debtor upon confirmation of a chapter 11 plan pursuant to Section 1141, the function of listing exemptions is principally to assist in the liquidation analysis required by Section 1129(a)(7)). That function is not affected by this court's ruling.

It might be argued that the rapidity of a chapter 13 proceeding justifies holding the creditor to the requirements of Bankruptcy Rule 4003(b), because some chapter 13 cases (such as this one), will turn on whether the creditor's lien can be avoided under Section 522(f). Thus, the argument might

go, the debtor will quickly know whether the lien can be avoided for purposes of plan confirmation by referring to whether the creditor timely objected to the claimed exemptions.

The flaw in this argument is that the debtor has to file a motion and afford the target creditor an opportunity for a hearing anyway if he wants to avoid a creditor's lien under Section 522(f). *See* Bankruptcy Rule 4003(d) (Norton pamphl.ed. 1987) ("a proceeding by the debtor to avoid a lien ... under § 522(f) of the Code shall be by motion in accordance with Rule 9014"); Bankruptcy Rule 9014 (Norton pamphl.ed. 1987) ("In a contested matter in a case under the Code not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought").[8] If the creditor objects, a hearing will have to be conducted in any event (as was the case here) before confirmation of the plan can be considered. Litigating the exemption issue in the context of this hearing does not lengthen the chapter 13 process. All the debtor has lost is an unwarranted procedural advantage. *See In re Starns,* 52 B.R. 405, 410–411 (S.D.Tex. 1985).

### C. *The nature of estoppel*

In *Hahn,* the court concluded that a failure to object under Bankruptcy Rule 4003(b) would be fatal to a judgment lien creditor's subsequent attempts to defend on grounds of invalidity of the exemption under Section 522(b). The argument was premised in part on estoppel. The court reasoned that

The Congressional intent to undo the "race to the Courthouse," and the lack of a more involved statutory test, evidence

---

8. In some locations it has been the practice in operative Chapter cases commenced by individual debtors, especially in Chapter 13 cases, for a debtor to use the filed plan as the vehicle for listing and avoiding judicial liens.... It is doubtful whether this practice conforms with the contested matter proceedings contemplated by Rule 9014.

*Norton Bankr. Law & Prac.,* Rule 4003(d), Editors' Comment (1983) at p. 250 (1987). *In re Schyma,* 68 B.R. 52, 66 n. 11 (Bankr.D.Minn. 1985) ("The preferable procedure, one which would allow full opportunity to litigate all the issues specific to § 522(f), is to avoid the lien by motion pursuant to Bankr.R. 4003(d)"); *contra In re Leecan,* 27 B.R. 907, 909 (Bankr.E.D.Pa. 1983).

Congress' intent to prohibit the relitigation of settled exemption disputes in the context of a § 522(f)(1) lien avoidance motion. Simply stated, if a judgment lien creditor does not properly litigate a debtor's entitlement to the underlying exemption within the time frame established under BANKR.R. 4003(b) ... he is estopped from litigating that issue in the debtor's ensuing motion under § 522(f)(1).

*In re Hahn,* 60 Bankr. 69, 76 (Bankr.D. Minn.1986). However, the "settled exemption disputes" to which the *Hahn* court makes reference do not in fact settle the issues raised under Section 522(f). To reiterate, the failure to object merely means that the property claimed as exempt by the debtor becomes exempt not by virtue of Section 522(b) but by virtue of Section 522(*l*). Section 522(f) requires an inquiry into whether the property in question *would have been* exempt under Section 522(b). *Matter of Allen, supra.* That exemption issue, then, is not "settled" for purposes of lien avoidance motions.[9]

The estoppel concept upon which the *Hahn* decision purports to be premised bears further examination. It has been said that "[p]erhaps no other technical legal term is more loosely used than the term 'estoppel.' " 28 *Am.Jur.2d,* Estoppel and Waiver, § 1, p. 599 (1966). It is a flexible doctrine "which should be applied when the equities of the situation necessitate its implementation." *Matter of Howard's Appliance Corp.,* 69 B.R. 1015, 1021 (Bankr.E.D. N.Y.1987). "[E]stoppel means nothing more than the application of the rules of

fair play." *Id.,* citing *Schatzman v. Dep't of Health and Rehabilitated Services, State of Florida (In re King Memorial Hospital, Inc.),* 19 B.R. 885, 891 (Bankr.S. D.Fla.1982). On the other hand, "[i]t must be emphasized that estoppel is a doctrine that should not be applied by a court haphazardly." *Matter of Howard's Appliance Corp.,* 69 B.R. at 1021.[10]

The failure of TCB to timely object to Mitchell's exemption claims cannot trigger traditional principles of equitable estoppel, as at least two necessary elements are missing. First, there is (and has been) no showing that TCB intended to mislead the debtor or influence the debtor to act or forebear to act. Second, there has not been any peculiar reliance on the part of the debtor which one could call injurious or detrimental. 28 *Am.Jur.2d,* Estoppel and Waiver, § 35, pp. 640–41 (1966). The debtor would have had to have filed this action in order to avoid TCB's lien in any event. *See* Bankruptcy Rule 4003(d). The only "prejudice" that the debtor suffers is having to defend the legitimacy of its exemption claim, a result that does not offend this court's sense of "fair play" especially in light of the extraordinary remedy that Section 522(f) represents. *See Schatzman, supra.*

The doctrine of judicial estoppel is similarly unavailable. The doctrine "may be applied when a party has successfully taken an affirmative position regarding material facts in prior court proceedings, and prevents that party from asserting an inconsistent position in later proceedings." *In re Caro Area Services for the Handi-*

---

**9.** *Hahn* addressed these issues in the context of a chapter 7 proceeding. In liquidation, the dispute resolved by Bankruptcy Rule 4003(b) is one between the debtor and his or her unsecured creditors, who are each competing for the limited unencumbered resources of the estate. Secured creditors have their liens, which remain unaffected by the exemption decision forced by Bankruptcy Rule 4003(b). *Robinson v. Olin Federal Credit Union,* 48 B.R. 732, 739 (D.Conn.1984). The unsecured creditors (and their spokesperson, the trustee) are the ones affected by the debtor's exemption decisions, and it is they who are most affected by the estoppel raised by Section 522(*l*). *See In re Payton,* 73 B.R. 31 (Bankr.W.D.Tex.1987). For unsecured creditors, the exemption issue is in-

deed settled after the expiration of the thirty day period specified in the rule. The "pool of assets" from which they may recover has been irrevocably reduced by the amount of assets removed for the debtor's fresh start.

**10.** It is still the rule that estoppels should be resorted to solely as a means of preventing injustice and should not be permitted to defeat the administration of the law, or to accomplish a wrong or secure an undue advantage, or to extend beyond the requirements of the transactions in which they originate. 28 *Am.Jur.2d,* Estoppel and Waiver, § 3, p. 601 (1966).

*capped*, 53 B.R. 438, 441 (Bankr.E.D.Mich. 1985), citing *In re Johnson*, 518 F.2d 246, 252 (10th Cir.), *aff'd sub nom., Clark v. Johnson*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975). "Judicial estoppel is intended to protect the integrity of the judicial process by preventing intentional inconsistency." *In re Taylor*, 72 B.R. 696, 699 (Bankr.E.D.Tenn.1987), citing *Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595, 599 (6th Cir.1982). *See also Texas Co. v. Gulf Refining Co.*, 26 F.2d 394, 397 (5th Cir.1928); *USLife v. U.S. Life Ins. Co.*, 560 F.Supp. 1302, 1305 (N.D.Tex.1983). In *US-Life*, then District Judge Robert Hill distinguished judicial estoppel from equitable estoppel, noting that the latter "applies when one of the parties has detrimentally relied upon the position taken by the other party in the earlier proceeding" while the former "looks to the relationship between the litigant and the judicial system ... courts seek to prevent parties from 'playing fast and loose' with them to suit the exigencies of self interest." *USLife v. U.S. Life Ins. Co.*, 560 F.Supp. at 1304–05.

■ The doctrine requires an *affirmative* position to have been taken by the party to be estopped and that position to have been successfully maintained. *In re Johnson, supra; USLife v. U.S. Life Ins. Co., supra.* TCB has not heretofore taken an affirmative position regarding the debtor's exemption claims in this or any prior proceedings. Nor can it fairly be said that TCB successfully *maintained* the position that Mitchell is entitled to his exemptions as claimed.

The function of judicial estoppel is to minimize the risk of inconsistent results. "If the second court were to adopt a party's position where that party was successful in a prior proceeding [with an opposite position], then at least one court has probably been misled." *USLife v. U.S. Life Ins. Co.*, 560 F.Supp. at 1305 (citing *Edwards v. Aetna Life Ins. Co., supra*). No such danger is presented in the case of lien avoidance actions where the creditor has failed to object to claimed exemption, because the exemption itself is not in jeopardy. If a court rules that the exemption is unavailable under Section 522(b), the only consequence is that the creditor's lien cannot be avoided. The exemption itself, obtained by virtue of Section 522(*l*), remains undisturbed, invulnerable to attack from any other quarter. *In re Payton*, 73 B.R. 31, 31 (Bankr.W.D.Tex.1987). Thus, no inconsistent position results.[11]

■ An estoppel by silence may be raised where (1) there is a duty to speak, (2) the party being estopped has had an opportunity to speak, and (3) there is an injury to the party invoking the doctrine. *In re Ellison Associates*, 13 B.R. 661–675–76 (Bankr.S.D.N.Y.1981), *aff'd*, 63 B.R. 756 (S.D.N.Y.1983). There is no duty to object to exemptions, however, especially in a chapter 13 case.[12] In a chapter 7 case, where all the debtor's assets, both exempt and non-exempt, are held hostage by the chapter 7 trustee, the need for a prompt determination of the debtor's rights in his or her exempt property is clear. It is the purpose of Section 522(*l*) and Bankruptcy Rule 4003(b) to serve that need. *In re*

11. Arguably, if TCB *had* timely objected to the debtor's exemption claim and had *failed*, judicial estoppel would not prevent TCB from re-urging the invalidity of the exemption in the lien avoidance action. "[S]uccess in the prior proceeding is considered necessary for the estoppel to apply." *USLife v. U.S. Life Ins. Co.*, 560 F.Supp. 1302, 1305 (N.D.Tex.1983). It is difficult to imagine why TCB would be permitted to litigate the issue twice by objecting yet not at all be failing to object and still remain true to the principles of fair play which underlie the estoppel doctrine. "To estop a party from urging a position is an extreme measure which should only be taken where the equities are clearly in its favor." *Id.* at 1306.

12. In fact, no duty arises in any event. A secured creditor is not obligated to object to a debtor's claim of exemption or to file a proof of claim in order to *preserve* its lien. *Robinson v. Olin Federal Credit Union*, 48 B.R. 732, 739 (D.Conn.1984), *citing In re Certain*, 30 B.R. 379 (Bankr.D.Conn.1983); *In re Pierce*, 29 B.R. 612 (Bankr.E.D.N.C.1983); *In re Weathers*, 15 B.R. 945 (Bankr.D.Kan.1981). If a debtor subsequently decides to try to *avoid* the creditor's lien, it is the *debtor* who must prove up his or her entitlement to the exemption as part of his or her cause of action. *In re Shands*, 57 B.R. 49, 50 (Bankr.D.S.C.1985).

*Starns,* 52 B.R. 405, 410 (S.D.Tex.1985). In a chapter 13 case, however, the debtor never surrenders possession of his property to the trustee. 11 U.S.C. § 1306(b) (Norton pamphl. ed. 1987). The distinction between exempt and non-exempt property becomes of less or perhaps no importance. *Grenco Real Estate Investment Trust v. Morris (In re Morris),* 48 B.R. 313, 314 (W.D.Va.1985) (exemptions are merely informational to permit evaluation of plan under § 1325(a)(4)). Creditors are thus less concerned with what the debtor asserts to be exempt, because they will be bound by the plan anyway. *See* 11 U.S.C. § 1327(a) (Norton pamphl.ed. 1987). On confirmation of the plan, all the property of the debtor, whether claimed exempt or not, will belong to the debtor, and upon completion of the plan, the debtor and all of his or her unencumbered property will be discharged from creditors' claims. *See* 11 U.S.C. §§ 1327(b), 1328(a). The *raison d'etre* for objecting to a debtor's exemption claims thus evaporates in a chapter 13 case, and with it any associated duty to object. If it makes no difference whether the debtor does or does not assert exemptions, then it can make no difference whether one objects to those exemption claims. If it in turn makes no difference whether one objects to those exemptions if claimed, then the failure to object can hardly operate as an estoppel.[13]

Finally, principles of res judicata and collateral estoppel are inapposite to the case at hand. Res judicata bars relitigation of the same cause of action. *Southmark Properties v. Charles House Corp.,* 742 F.2d 862, 869 (5th Cir.1984); *Lubrizol Corp. v. Exxon Corp.,* 632 F.Supp. 326, 329 (S.D.Tex.1986). The merits of the current action must have already been litigated for the doctrine to apply. *F.T.C. v. Evans Products Co.,* 60 B.R. 829, 832 n. 1 (W.D. Wash.1986). Whether the creditor's lien can be avoided is certainly not decided by whether the assets the debtor has claimed as his exempt property are in fact removed from the estate's administration. Res judicata therefore does not apply. *See Matter of Braniff Airways, Inc.,* 783 F.2d 1283, 1289 (5th Cir.1986) ("bankruptcy courts typically allow creditors to press their claims more than once, as circumstances change.... if reasonable doubt exists as to what was decided in the first action, the doctrine of res judicata should not be applied").

Collateral estoppel requires that the same issue has been actually litigated in a prior judgment and that the issue was essential to the prior judgment. *Id.; In re Sono,* 58 B.R. 351, 352 (Bankr.E.D.Tenn. 1986). The "issue" of exemption has not been litigated before in this case. Even if it could be said that Bankruptcy Rule 4003(b) operated to decide the issue, however, the only issue precluded was whether the claimed assets are exempt property pursuant to Section 522(*l*). *In re Payton,* 73 B.R. 31 (Bankr.W.D.Tex.1987). Whether the exemptions are in fact valid under Section 522(b), the issue necessary to sustain a lien avoidance action, has not yet been tested. *Matter of Allen,* 725 F.2d 290, 292 (5th Cir.1984).

For all the foregoing reasons, this court holds that a creditor is permitted to contest whether the exemption on which a lien avoidance action is premised is in fact "an exemption to which the debtor *would have been*" entitled under Section 522(b)," regardless whether the property has already been deemed exempt by virtue of Section 522(*l*). 11 U.S.C. §§ 522(f), 522(*l*) (Norton pamphl.ed. 1987).

## II. UNDER TEXAS LAW, IS THE DEBTOR PERMITTED TO CLAIM THE HILLSBORO PROPERTY AS HIS HOMESTEAD FOR PURPOSES OF LIEN AVOIDANCE?

Having concluded that the validity of the exemption was properly placed in issue, this court now turns to whether the exemption itself would have been available under

---

**13.** In any event, no injury results to the debtor, other than having to defend the validity of the claimed exemption. Section 522(f) requires such a showing in any event. *Matter of Allen,* *supra.* No injury can result from a debtor being compelled to do that which he or she was obligated to do in any event.

Section 522(b). As the debtor elected the state exemptions, this requires an examination of Texas law relating to homesteads.

### A. The nature of the homestead under Texas law

In Texas, the homestead is a possessory right which inures to the benefit of a *family unit*. *Matter of Claflin*, 761 F.2d 1088, 1091 (5th Cir.1985); *Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 568 (Tex.1972) and cases cited therein. In this case, the family in question is the debtor, his new wife Myra, and his two step children by his wife's first marriage.[14] There is no question that the Mitchell family's use of the Garland property qualifies it for exemption as a homestead and the debtor so acknowledged in his post-trial letter brief.

The debtor argues that the family's use of both properties renders both the Garland and the Hillsboro properties susceptible of homestead characterization and that therefore the debtor is entitled to designate which property he will claim as exempt. *See American State Bank & Trust Co. v. Johnston*, 58 S.W.2d 880 (Tex.Civ.App.—San Antonio 1933, writ ref'd); *Parrish v. Hawes*, 66 S.W.2d 209 (Tex.1902). To determine whether this dual residence doctrine is applicable, we must examine whether the Hillsboro property actually qualifies as a potential candidate for homestead. In order for a property to so qualify,

> there must be proof of concurrence of usage of, and intent by the owner to claim, the land as homestead. Both are

necessary to give homestead rights to the property. Neither use without intent nor intent without use will confer homestead rights.

43 Tex.Jur.3d, Homesteads, § 60 (1985); *Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 568 (Tex.1972); *Ellisor v. Ellisor*, 630 S.W.2d 746, 747 (Tex.Civ.App.—Houston [1st Dist.] 1982, no writ); *McFarlane v. First Nat. Bank*, 97 S.W.2d 754, 760 (Tex. App.—Beaumont 1936, writ ref'd).

Mitchell and his wife Myra contend that they have the requisite intent to make the Hillsboro property their homestead. Both testified with great conviction that they prefer living in the country and, as soon as the boys graduate from school in Garland, they want to move down to the Hillsboro property permanently. Notwithstanding these remonstrations, however, "so long as one place is actually occupied as a home, another place cannot be impressed with the homestead character by an intention to use it as a home in the future." *Carstens v. Landrum*, 17 S.W.2d 803, 805 (Tex.Com. App.1929). *Tidewater Oil Co. v. Ross*, 123 S.W.2d 479, 484 (Tex.Civ.App.—Galveston 1939), *aff'd* 136 Tex. 66, 145 S.W.2d 1089 (1940).[15]

The debtor maintains that this case falls within the ambit of those Texas cases which hold that a court may (or may be required to) honor a debtor's subjective intent when more than one property is actually used as a residence under circumstances sufficiently ambiguous that it is impossible to tell which property is the debtor's homestead merely from observing how it is

---

**14.** That the exemption issue turns on which property the Mitchell *family* uses as its homestead is not affected by the fact that Mitchell filed bankruptcy separately (i.e., this is not a joint petition). Having elected the state exemptions, the exemptions to which he is entitled in the bankruptcy case are governed by the law of the state in which he filed. *In re Bessent*, 831 F.2d 82 (5th Cir.1987). He may not, under Texas law, claim an exemption as though he were a single person once he is married. *Wallingsford v. Bowen*, 104 S.W.2d 188, 190 (Tex.Civ. App.—1937, no writ).

**15.** In the absence of actual occupancy of a given property, intent to use coupled with overt acts of preparation evidencing such intent may satisfy the requirement of use and intent to use.

*Simank v. Alford*, 441 S.W.2d 234 (Tex.Civ.App.—Austin 1969, writ ref'd n.r.e.). The exception is designed to aid the debtor attempting to make a currently unlivable tract into a livable one. *Jolesch & Chaska Co. v. Hampton*, 297 S.W. 271, 274 (Tex.Civ.App.—Waco 1927, writ ref'd). Where a homestead claimant already *has* a home, he cannot use the exception because the current home cannot be abandoned while still being used as the debtor's homestead. *Bass v. Ware*, 203 S.W.2d 1001, 1001 (Tex.Civ.App.—Waco 1947, writ ref'd n.r.e.); *Panhandle Construction Co. v. Continental Savings & Loan Ass'n*, 110 S.W.2d 632, 635 (Tex.Civ.App.—1937, writ dism'd w.o.j.). This exception is thus not available to Mitchell.

used. *Wooton v. Jones*, 286 S.W. 680 (Tex. Civ.App.—Austin 1926, writ dism'd); *Carsten v. Landrum*, 17 S.W.2d 803 (Tex.Com. App.—1929, op. adopted); *American State Bank & Trust Co. v. Johnston*. 58 S.W.2d 880 (Tex.Civ.App.—San Antonio 1933, writ ref'd); *Ackerson v. Farm & Home Savings & Loan Ass'n*, 77 S.W.2d 559 (Tex.Civ.App.—San Antonio 1934, writ ref'd). *see also In re Neale*, 274 F.Supp. 969, 974 (N.D.Tex. 1967). In the words of the court in *Wooton v. Jones*.

> A man may have two or more residences at the same time, but he cannot have more than one homestead. Hence, when he occupies as a residence a place in town and another in the country, *under such circumstances that either may be his homestead* according to his intention, it is evident that the physical facts alone cannot be relied upon as giving notice that either property is homestead as against the other.

*Wooton v. Jones*, 286 S.W. 680, 687 (Tex. Civ.App.—Austin 1926, writ dism'd) (emphasis added).[16] The physical facts surrounding the debtor's use of the two properties in question must therefore create such ambiguity that one cannot tell from mere observation which of the two properties is in fact the debtor's homestead. If there is no ambiguity, designation is immaterial. *Panhandle Construction Co. v. Continental Savings & Loan Ass'n*, 110 S.W.2d 632, 634–35 (Tex.Civ.App.—1937, writ dism'd w.o.j.).

A comparison of the fact patterns which have led to a finding of ambiguity easily demonstrates that the facts of this case do not qualify for such a finding.

In *American State Bank & Trust Co. v. Johnston,* the Johnstons moved onto property which had been in Mrs. Johnston's family for many years. They dug wells, built a "jacal"—a thatched-roof house with walls made out of mud and timbers—into which they moved, then a frame house, tilled the land, and had three children. Ten years later, they purchased two lots in the city of Mercedes, a few miles from the ranch, and built a house on it. "[T]hey lived therein during the school term beginning in 1915, and through every school year thereafter. Mr. Johnston spent most of his time on the ranch, and Mrs. Johnston and the children spent the week-ends, in good weather, and the time between school terms, at the ranch. Johnston ... was engaged in farming and stock raising." *American State Bank & Trust Co. v. Johnston*, 58 S.W.2d 880, 881 (Tex.Civ.App.—San Antonio 1933, writ ref'd). In reviewing these facts, the court commented:

> We are therefore relegated to the controlling question: Do the facts present a situation of ambiguity in which appellees could rationally and reasonably say and maintain that the Mercedes place, or the ranch property, either, was their homestead? ... If so, then their election of the one, being specific and deliberate, was binding upon them ... From all the facts stated it does seem obvious that appellees could claim and enforce the homestead exemption upon either the town or the ranch place.

*Id.* at 882.

The father in *Carstens v. Landrum* sent his wife and some of the children off to the city for schooling and for earning extra income while he and his older children continued to work the farm. Though most of the furniture and household effects were moved to San Antonio, where Landrum's wife was living with some of the children in rented facilities, Landrum himself continued to live on the farm, renting out part of it and farming part of it. His married son lived there with him, helping him to work

---

**16.** The debtor relies on the *Wooton* decision's statement that "such situation when it arises presents a most appropriate case for a homestead designation by the parties who have the *right* to resolve in their own minds the dilemma which the physical facts, created by their own conduct, present." *Wooton v. Jones*, 286 S.W. at 687 (emphasis added). Whether such an affirmative right exists is not at all clear from the Texas cases, which have, for the most part, dealt in the context of finding an *estoppel* as a *result* of the designation. Where the physical facts offer no guidance, however, it would seem that the debtor's *intent* must be honored, requiring the court to defer to a debtor's choice. *See In re Neale,* 274 F.Supp. 969, 974 (N.D.Tex.1967) (bankruptcy appeal from a bankruptcy referee's denial of exemption claim).

the farm. At no time did either he or his wife ever abandon the farm. Shortly after taking out a loan on the farm, however, the family moved into a house in San Antonio they had purchased with the proceeds of the loan. They then returned to the farm for a period of three years before returning again to San Antonio. The court found that, "In light of the attending circumstances, the occupancy of the farm by Landrum and his little boy was palpably ambiguous in respect of the homestead intention ..." *Carstens v. Landrum*, 17 S.W.2d 803, 805 (Tex.Com.App.1929).

The present facts do not present the sort of ambiguity with which the courts in *Johnston* and *Carstens* struggled. Regardless where Mitchell might have lived before he got married, there can be little doubt where he resided once he married Myra. The children attend school in Garland. He keeps his work clothes in Garland. Both he and Myra work in the Dallas area. Neither of them are farmers. *Davis v. McClurken*, 378 S.W.2d 358 (Tex.Civ. App.—Eastland 1964, no writ); *Vaughn v. Vaughn*, 279 S.W.2d 427, 436–37 (Tex.Civ. App.—Texarkana 1955, no writ) (collecting rents from another who farms the property not sufficient to show use as homestead). What is more, the Hillsboro property is already home to Mitchell's parents. It is not Mr. Mitchell's homestead, left over from his single days. *Wallingford v. Bowen*, 104 S.W.2d 188, 190 (Tex.Civ.App.— Amarillo 1937, no writ) (even if property was a person's homestead prior to marriage, it ceases to be so when the person marries and moves into his or her spouse's home); *Crowder v. Union Nat. Bank*, 114 Tex. 34, 261 S.W. 375 (1924) (a wife and husband may not each have a homestead). In short, it cannot be said that the physical facts surrounding the Mitchells' use of the Hillsboro property would place anyone on notice that the property might be their

homestead. No ambiguity of the sort found in *Johnston* and *Carstens* is created by the use to which the Mitchells put the Garland and Hillsboro properties.

Nor does the evidence warrant a finding that the Hillsboro property is a summer home of the sort in *Fain–Townsend Co. v. Barker*, 109 S.W.2d 1101 (Tex.Civ.App.— Galveston 1937, no writ). There the court found that the Barkers "led a migratory existence, having their home in the winter months in Houston, and in Crockett in the summer months." Barker was a travelling man who only spent the weekends with his family. When his family was in Houston, he spent his weekends there. In the summer, when the family moved to Crockett, he spent his weekends there. Mrs. Barker kept her household goods in Crockett, but lived in Houston during the school year at the home which she and her husband had purchased after their marriage. They continued this life style for over ten years. *Fain–Townsend v. Barker*, 109 S.W.2d at 1101.[17] The Mitchells by contrast do not use the Hillsboro property as their "summer home" as did the Barkers (who evidently had the economic wherewithal to support such a migratory lifestyle). The Mitchells each have office jobs in Dallas year round, to which they must commute. Hillsboro is seventy miles away and is not serviced by a rapid transit system. The court does not find credible the Mitchells' testimony that they would "routinely" commute to Dallas from Hillsboro, especially as Mr. Mitchell keeps his business clothes at the home in Garland.

The facts of this case appear to better comport with the facts in cases such as *In re Neale* and *Hilliard v. Home Builders Supply Co.*, 399 S.W.2d 198, 201 (Tex.Civ. App.—Ft. Worth 1966, writ ref'd n.r.e.) ("The mere fact that they may have actually resided in the house over weekends or at

---

**17.** Significantly, the *Barker* court's opinion merely states that "[w]e cannot agree with appellant that, when the Houston property was bought, and became occupied for the winter months, it became their homestead *as a matter of law*. There was sufficient evidence before the jury to sustain their finding that the Crockett property was the homestead of ... Barker."

*Fain–Townsend v. Barker*, 109 S.W.2d at 1102. Thus, in the court's opinion, the issue presented by the Barkers' use of the two properties was one of fact rather than of law and the evidence at trial did not *compel* the result reached by the jury, but was merely sufficient to avoid a reversal on appeal.

other times of longer duration standing alone does not convert it to a homestead"). *See also Purdin v. Jenkins,* 337 S.W.2d 418 (Tex.Civ.App.—Dallas 1960, no writ). To quote the district court in *Neale.*

> There is not here presented a case in which the bankrupt has dual residences such as obfuscate a determination of his homestead. Neither Mr. Neale nor his family made such use of the farm as to render it their "sanctuary of secure asylum." It was not a "home" from which they were absent by reason of necessity or convenience. The farm was but a retreat, advantage of which was taken by the Neales during their leisure time.

*In re Neale,* 274 F.Supp. at 974. The court therefore finds that the rule suggested in *Wooton v. Jones* is inapposite to this case.

### B. *The effect of the divorce decree on the homestead selection*

■ The debtor also contends that the Garland property is not available as a homestead because it is subject to the property settlement provisions of a divorce decree (from Myra's previous marriage) which require that, when Myra remarries, the Garland property must be sold and the proceeds divided. Thus, the argument goes, the family will be left without a homestead unless the Hillsboro property can be claimed.

The argument fails on two counts. First, the sale of the property would not of itself divest the Mitchells of their homestead, because the homestead interest continues in the proceeds. Tex.Prop.Code, § 41.002(b) (Vernon Supp.1987); *Trioo v. Trioo,* 18 S.W. 313, 317 (Tex.Sup.1891). That the proceeds from the sale after division might be less than sufficient to purchase another such home is of no legal significance.[18] Second, because homestead is determined by use, it is entirely possible

for someone to own only one piece of real property, yet not have a homestead. *Cheswick v. Freeman,* 155 Tex. 372, 376, 287 S.W.2d 171, 173 (Tex.1956); *Silvers v. Welch,* 127 Tex. 58, 91 S.W.2d 686, 688 (Tex.Com.App.1936). In *Cheswick,* the claimant owned no other property, but did not live on the property he sought to claim. The court found no overt acts evidencing an intent to return to the land and make it his home, even though he had previously lived on the property when his mother was still alive (and when it was her homestead). He therefore failed to establish a homestead right in the only piece of real estate he owned. *Id.; accord Silver v. Welch, supra; see Matter of Claflin,* 761 F.2d at 1091.[19] No different result need be reached here.

## CONCLUSION

The court concludes that TCB was not prevented from raising the debtor's entitlement to a homestead exemption in the Hillsboro property as a defense to the debtor's lien avoidance action brought to avoid TCB's judicial lien under Section 522(f), notwithstanding TCB's failure to object to the debtor's claims of exemption within thirty days after the first meeting of creditors. The court further finds that the Hillsboro property is not exempt as the debtor's homestead under Texas law and TCB's judicial lien may therefore not be avoided by the debtor. Because the lien cannot be avoided, the debtor's plan which hinged on that avoidance cannot be confirmed.

---

18. While it is true that Myra will only receive a portion of the proceeds, she is married to another "economic unit" whose resources, pooled with the proceeds, would be applied to the purchase of a new home. The fact that second unit is not affluent is a matter of social but not legal significance. Besides, a contrary ruling would compel varying results depending on the economic climate at the time of the sale of homestead property.

19. It is important to recall that actions taken by Mitchell relative to the Hillsboro property *prior* to his marriage to Myra are not legally relevant. *Wallingford v. Bowen,* 104 S.W.2d 188, 190 (Tex. Civ.App.—Amarillo 1937, no writ).