**In re PINTO TRUCKING
SERVICE, INC., Debtor.**

**William SCHAPS, Trustee for Pinto
Trucking Service, Inc., Plaintiff,**

v.

**JUST ENOUGH
CORPORATION, Defendant.**

**Bankruptcy No. 85–04753S.
Adv. No. 87–0829S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 21, 1988.

---

Stephen Raslavich, Philadelphia, Pa., for Trustee.

George Luskus, Philadelphia, Pa., for defendant.

Marvin Krasny, Philadelphia, Pa., for Debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding features a creative invocation by the Trustee of a Chapter 7 business Debtor of his powers to avoid certain transactions of the Debtor as fraudulent conveyances. Herein, the Trustee attempts to set aside a transfer of the Debtor's stock, ultimately proven worthless, to one of the factions involved in pre-petition litigation over control of the Debtor to settle that litigation. However, the disputes resolved by the transfer were multifaceted, and the resolution was made in arms-length negotiations which were approved by all parties engaged in the dispute, including a neutral peacemaker, a court-approved "conservator" of the Debtor, and the court in which the litigation was pending. We therefore conclude that the Trustee failed to meet his burden of proving that the Debtor failed to receive adequate consideration in the settlement of the litigation. We also fail to find any intent to defraud creditors on the part of the Debtor-transferee in entering into the settlement transaction. These conclusions are fatal to the Trustee's claims under 11 U.S.C. § 548(a) of the Bankruptcy Code, as well as his claims based on state fraudulent conveyance and corporate laws. We therefore render judgment in favor of the Defendant.

### B. PROCEDURAL HISTORY

On or about November 5, 1985, the Debtor filed the underlying bankruptcy case under Chapter 11 of the Bankruptcy Code. On January 31, 1986, upon motion of the Debtor to convert this case to a proceeding under Chapter 7 of the Bankruptcy Code, an Order of conversion was entered and William Schaps, the Plaintiff herein, was appointed Interim Chapter 7 Trustee (herein "the Trustee"). On September 11, 1987, the Trustee instituted the instant adversary proceeding against the Defendant, JUST ENOUGH CORPORATION (hereinafter "JEC").

After a series of continuances, the matter came before us for trial on May 25,

1988. On that date, the Trustee presented all of his witnesses, Accountant Stanton Remer, the Trustee himself, and, as of cross-examination, Biagio (Bob) Pinto, the principal of JEC. The trial was adjourned by agreement of counsel, until June 24, 1988, at which time JEC called its witnesses: Mr. Pinto again; the counsel who represented his faction in the state court litigation, John M. Gallagher, Esquire; the state-court conservator, Charles F. Knapp, Esquire; the "peacemaker," Accountant Stephen A. Cohen; and three expert witnesses on the issue of the improvements made to the property transfer to JEC subsequent to the transfer. Since we deem it unnecessary to rule on the issue of such improvements, we do not refer to the testimony of the last three witnesses hereafter.

At the close of the case, we issued an Order allowing the parties an opportunity to submit Proposed Findings of Fact, Proposed Conclusions of Law, and Briefs at 30–day intervals after completion of the Transcript, and the Trustee an opportunity to file a Reply Brief a week thereafter. All of these submissions were timely filed as of October 20, 1988. We note that the submissions of the parties amounted to 157 pages of materials, mostly in the form of long, analytical Briefs. These submissions were generally thoughtful and helpful, as no precedent presenting an analogous factual setting to the instant proceeding has been identified.

Pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 52(a), we shall present our decision in the form of Findings of Fact and Conclusions of Law/Discussion, including, in the latter, our reasoning as to each conclusion reached immediately after its recitation.

## C. FINDINGS OF FACT

1. The Debtor, PINTO TRUCKING SERVICE, INC. (hereinafter "the Debt-

or"), was incorporated in 1952 by Biagio and Joseph Pinto and engaged in an air-freight pick-up and delivery business.

2. Biagio Pinto (hereinafter "Bob") was President and/or Chairman of the Debtor from 1952 until October, 1982, when he was incarcerated for matters apparently unrelated to this litigation.

3. In some fashion unexplained in the record, Joseph Pinto (hereinafter "Joe"), in charge of maintenance in the business prior to Bob's departure, allowed ownership of the Debtor's stock, which had previously been exclusively in the hands of the Pinto family, to be transferred in whole or in part to one Henry Bono (hereinafter "Bono"), who previously had operated only a New York City terminal of the Debtor.

4. In June, 1984, upon Bob's release from prison, he, Joe, and JEC instituted a so-called [1] stockholder's derivative action in the Court of Common Pleas of Delaware County, Pennsylvania (hereinafter "the C.P.Ct."), against several Defendants, including the Debtor and Bono, in order to attempt to regain control of the Debtor.[2]

5. The plaintiffs in this action were represented by John M. Gallagher, Esquire (hereinafter "Gallagher"). On June 28, 1984, the C.P.Ct. issued a Preliminary Injunction, which, *inter alia*, appointed Charles F. Knapp, Esquire (hereinafter "Knapp"), as "conservator" of the Debtor. This term was utilized instead of "receiver" to allay any concerns that the Debtor was financially troubled.

6. Knapp ascertained that the incumbent Bono faction presented a more competent management team than the Pinto faction, and therefore, over the protests of the Pinto faction, he refused to oust the Bono faction from management.

7. Ultimately concluding that the opposing factions were destructively intractable,

---

1. The term "so-called" appears here because a stockholders' derivative suit would normally be brought solely on behalf of the corporation, and relief would normally be sought for the corporation itself. *See, e.g., Clarke v. Greenberg,* 296 N.Y. 146, 71 N.E.2d 443, 445 (1947). *Cf.* F.R. Civ.P. 23.1. Here, the Pinto faction was ultimately willing to opt out of the corporation and simply recover damages for their own grievances against the Bono faction.

2. We are hampered in analyzing this suit fully by the failure of either party to mark as an exhibit, nor offer to admit into evidence, the Complaint in this lawsuit.

Knapp, in late summer, 1984, engaged Stephen A. Cohen (hereinafter "Cohen"), an accountant who had previously worked with both factions and was trusted by both, to assist him in attempts to settle this litigation and all differences between the two factions.

8. On October 3, 1984, after a lengthy negotiating session orchestrated by Knapp and Cohen and conducted at Knapp's law office, the parties settled this litigation as well as all other differences between them, which included a lawsuit brought against the Debtor by another Pinto-owned entity, Pennsylvania Stable and Terminals, Inc. (hereinafter "PST"), seeking to recover, *inter alia*, a balance of about $850,000.00 remaining from sums which PST had allegedly advanced to the Debtor from 1972 to 1979.

9. Featured in the settlement was the Debtor's agreement to transfer a portion of the real estate from which it operated its business headquarters at 1414 Calcon Hook Road, Darby Township, Pennsylvania, to JEC, subject to JEC's agreement to lease back the property to the Debtor for not more than one year. Counsel in this proceeding agree that the property transferred was worth $250,000.00 at the time. Also, the Debtor agreed to transfer, to the Pinto faction, $250,000 from the Debtor's profit-sharing plan. In addition, each faction released the members of that faction from liability from all past claims against members of the other faction, which eliminated the suit brought by PST in the C.P.Ct. and wiped out accounts receivable of the Pinto family in favor of the Debtor in the amount of $639,129.13 which had previously been carried on the Debtor's books.

10. The legitimacy of the claims set forth in the suit brought by PST and the accounts receivable of the Pinto family listed on the Debtor's books is difficult to measure. Bob testified, not surprisingly but without any direct rebuttal, that the claims asserted by PST were meritorious; that the accounts receivable listed were unknown to him and without basis; and that he was very reluctant to accept the

settlement offered. He stated that the solvency of the Debtor was not a factor in the negotiations.

11. Gallagher had little knowledge of the PST suit, because he was not handling same directly. He had no apparent knowledge of the book entries or the status of the Debtor's solvency. He counselled the Pinto faction to accept the settlement as an expedient alternative to long, acrimonious litigation.

12. Cohen, an accountant, testified that he believed that the Debtor was solvent at the time that the settlement was reached and that he urged the settlement as a fair means of bringing peace to a mutually-destructive situation.

13. Knapp did not engage in a weighing process in evaluating the settlement, nor did he consider the Debtor's solvency, but he believed that a resolution was important for the same reasons as Cohen, and that the parties were likely to have reached an agreement that was equitable to all interests, in light of the hard feelings between them.

14. Bob's evaluation of the strength of his bargaining position was probably unrealistic, but the cumulative testimony of all of these witnesses, particularly the disinterested and hence highly credible testimony of Knapp and Cohen, established that, from the vantage point of everyone involved in the transaction, the settlement was totally fair to both sides.

15. The settlement terms were presented to the Honorable Joseph T. LaBrum, Jr. of the C.P.Ct. and approved by him in an Order of October 4, 1984.

16. The Debtor delivered an executed deed to the Pinto family and JEC at a real estate settlement on November 1, 1984, in furtherance of the settlement. However, the parties were unable to record the executed and delivered deed at that time because approval of the subdivision of the Calcon Hook Road property and bulk sales certificates were required. These documents were hence held in escrow until all approvals were obtained. The Deed was not recorded until April 18, 1985, after the approvals were obtained.

17. Stanton Remer (hereinafter "Remer") was a partner in the same accounting firm as Cohen who was in charge of the independent audit of the Debtor's financial affairs for the years ending 1983 and 1984. He testified that the liabilities of the Debtor exceeded its assets as of December 29, 1984, due to significant losses during the year 1984, including the huge negative impact of the settlement on the assets of the Debtor, *e.g.*, the loss of a significant portion of its realty holdings, valued at $446,357.00 on the Debtor's books, and the writing off of the $639,129.13 in accounts receivable owed by the Pinto family on the books.

18. JEC made certain improvement to the realty obtained by it in the settlement transaction thereafter, causing its value to increase to at least $300,000.00 as of the time of the trial.

## D. CONCLUSIONS OF LAW/DISCUSSION

### 1. THE INSTANT MATTER IS A CORE PROCEEDING WHICH THIS COURT CAN DETERMINE.

There is apparently no dispute that the substance of this proceeding is within the scope of 28 U.S.C. § 157(b)(2)(H), *i.e.*, it is a proceeding to recover a fraudulent conveyance, and hence it is a core proceeding which this court is empowered to determine. 28 U.S.C. § 157(b)(1). We shall therefore proceed to determine it.

### 2. EACH OF THE TRUSTEE'S CAUSES OF ACTIONS REQUIRE US TO CONCLUDE THAT EITHER (1) THE DEBTOR TRANSFERRED PROPERTY TO JEC WITH AN ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD CREDITORS; OR (2) THE DEBTOR TRANSFERRED PROPERTY TO JEC FOR (A) LESS THAN FAIR CONSIDERATION (B) AT A TIME WHEN IT WAS INSOLVENT OR WOULD BE LEFT WITH UNREASONABLY SMALL CAPITAL.

Certain common elements must be proven by the Debtor to succeed on any of its asserted causes of action. The Trustee's initial cause of action arises from 11 U.S.C. §§ 548(a) of the Bankruptcy Code, which provides as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

His second cause of action is based upon the following sections of the Pennsylvania Uniform Fraudulent Conveyance Act, 39 P.S. §§ 354–57, which provide as follows:

§ 354. Conveyances by insolvent

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

§ 355. Conveyances by persons in business

Every conveyance made without fair consideration, when the person making it is engaged, or is about to engage, in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors, and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent.

§ 356. Conveyances by a person about to incur debts

Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

§ 357. Conveyance made with intent to defraud

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Finally, the Trustee also asserts a claim based upon that portion of the Pennsylvania Business Corporation Law, 15 P.S. § 1701 B(1)(i) which provides as follows:

B. Purchases or redemption by a business corporation of its own shares, whether direct or indirect, shall not be made except:

(1) In the case of shares which are not subject to redemption—

(i) to the extent of the aggregate of (a) its unrestricted and unreserved earned surplus and (b) as much of its unrestricted capital surplus as has been made available for such purpose by the prior affirmative vote obtained within one year of such purchase of the shareholders of each class entitled to cast at least a majority of the votes which all shareholders of such class are entitled to cast thereon, whether or not entitled to vote thereon by the provisions of the articles, which available capital surplus may, by resolu-

tion of the board of directors, be charged in connection with such purchase notwithstanding the existence of unrestricted and unreserved earned surplus sufficient to effect all or a part of such purchase.

■ In order to maintain a successful action pursuant to 11 U.S.C. § 548(a)(1) or 39 P.S. § 357, the Trustee must establish that a transfer is characterized by an "actual intent" of the transferor—here, the Debtor—to "hinder, delay, or defraud" any creditor. In order to maintain a successful action under 11 U.S.C. § 548(a)(2) or 39 P.S. §§ 354–56 a prerequisite is the proof that a transfer has been made for "less than a reasonably equivalent value in exchange" or "without fair consideration" and something more, *i.e.,* either a rendering of the transferor insolvent as a result of the transfer, or leaving a business-transferor with unreasonably small capital, or in the state of preparing to incur debts that it could not pay. The Corporation Law requirement is limited to stock-redemption situations and contains no "actual intent to defraud" alternative. However, in order for such a transaction to fall within the prohibitions of that section, the corporation must be left with unrestricted and unreserved earned surplus after making the transfer. We read this provision as another way of saying that if a corporation redeems its stock, it must receive fair consideration for same in the transfer transaction, or pursuant to 15 P.S. § 1707 B, the transferee-shareholder is liable to repay the value of the property transferred to it in exchange for the stock. The operation of this provision is therefore similar to 11 U.S.C. §§ 548(a)(2)(B)(i) and (ii) and 39 P.S. §§ 354 and 355.

3. THE TRUSTEE HAS FAILED TO ESTABLISH THAT THE DEBTOR INTENDED TO HINDER, DELAY, OR DEFRAUD ITS CREDITORS IN MAKING THE TRANSFERS PURSUANT TO THE SETTLEMENT AGREEMENT.

The Trustee argues that, alternatively, his case should succeed on the basis of 11

U.S.C. § 548(a)(1) and 39 P.S. § 357 because an "alarming number" of "badges of fraud" are established in the record. The Trustee's source of a "laundry list" of "badges of fraud" is the well-developed list set forth in § 4(b) of the proposed Uniform Fraudulent Transfers Act (hereinafter "UFTA"), which Pennsylvania has not enacted, which reads as follows:

(b) In determining actual intent ..., consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

7A UNIFORM LAWS ANNOTATED 653 (1965).

See also, e.g., In re Compton, 70 B.R. 60, 62 (Bankr. W.D.Pa.1987).

▆▆▆ Although we will accept the Trustee's reference to "badges of fraud" as set forth in the UFTA for purposes of this analysis, we note two general principles at the outset. First, it is the conduct of the transferor, i.e., the Debtor, which must be established to have been fraudulent, not the transferee, i.e., JEC or the Pinto faction. See In re Pinto, 89 B.R. 486, 498–99 (Bankr. E.D.Pa.1988).[3] Secondly, the burden of proof is not only upon the Trustee to prove this element, see In re Metro Shippers, Inc., 78 B.R. 747, 750 (Bankr.E.D.Pa.1987), but, since the element of actual fraud must be proven, the degree of proof required is to establish same is that of "clear and convincing" evidence. See, e.g., In re Borbidge, 90 B.R. 728, 734–35 (Bankr.E.D.Pa. 1988); In re Garcia, 88 B.R. 695, 698–702 (Bankr.E.D.Pa.1988); and In re Woerner, 66 B.R. 964, 971–72 (Bankr.E.D.Pa.1986), aff'd, C.A. No. 86–7324 (E.D.Pa. April 18, 1987). We therefore conclude that, in order to succeed in establishing that this transaction in issue may be overturned for "actual fraud," the Trustee has the burden of proving a goodly number of the "badges of fraud" by "clear and convincing evidence."

▆▆▆ The Trustee argues that "badges" 1, 2, 3, 4, 5, 6, 8, and 9 are evident. Except for "badge" 4 and 9, we disagree. Regarding badge 1, the transfer was made to an "insider." However, the situation was not a typical sort of insider transaction, which is clearly not an arms-length transaction and involves a corporation and a friendly officer or director. By way of complete contrast, the instant transfer involved parties whose very insider status had been undermined by an opposing faction, and with whom the transfer was clearly negotiated at arms-length. The first badge is therefore not present.

The second badge allegedly arises from the lease-back of the transferred portion of the realty for a year in the settlement. See Finding of Fact 9, page 383 supra. However, again, this badge is directed towards

---

**3.** This decision has no reference to the instant case despite involving debtors named "Pinto." Rather, it involves an alleged fraudulent conveyance by other debtors in a very different transaction who coincidentally have the same surname as the Pinto faction in issue here.

transactions where the Debtor, because of an arrangement with a friendly transferee, retains significant rights and use of the property transferred. Such facts are clearly not present here. The lease-back contemplated here was finite and apparently included merely to smooth a transition in use of the realty transferred for a period of not more than a year.

It is almost impossible to see how the third badge could even be claimed to be present here. The Trustee states that the "true nature" of the transaction was concealed. We disagree. Nothing was concealed; all negotiations and the settlement were open to all interested parties and became part of a public court record the day after the settlement was reached.

Clearly, the fifth and sixth badges are absent, despite the Trustee's lame attempts to argue that the Debtor's zero net worth after the transaction effectively "eliminated" the Debtor and left it in a position where it effectively "disappeared."

■ The eighth element raises the issue of the adequacy of the consideration. As we hold in the following headnote, we do not believe that the Trustee has sustained the burden of proof on this point. See pages 387–89 *infra*.

We believe that the Trustee is probably correct in contending that the Debtor became insolvent as a result of this transaction. However, because we fail to find the element of inadequate consideration, we decline to find a "constructive fraudulent conveyance." This is one of only two of eleven "badges of fraud" which we find present, clearly an inadequate basis on which to find an "actual fraudulent conveyance." We therefore need only discuss this issue summarily.

■ We agree with the Trustee that the significant element in determining when the transfer in issue took place was determination of when the deed representing the

transfer of the building in issue passed from the Debtor to JEC. This did not occur until April 18, 1985. Clearly, if the transfer involved only the transfer of the realty in issue, April 18, 1985, would be considered as the date of the transfer. See *In re MacQuown,* 717 F.2d 859, 863 (3d Cir.1983) ("Under Pennsylvania law, a transfer of real property is good as against a subsequent bona fide purchaser, mortgagee or judgment holder when the deed is recorded")[4]; *In re Jacobs,* 60 B.R. 811, 815–16 (M.D.Pa. 1985); and *In re Butler,* 75 B.R. 528, 532–33 (Bankr. E.D.Pa.1987), *aff'd,* C.A. No. 87–4455 (E.D.Pa. Dec. 18, 1987) [1987 WL 49441]. The only fact present there which made the *Butler* case a close one, *i.e.,* whether the time of transfer of a sheriff's sale should "relate back" from the date that the deed passes to the date of the sale, is not pertinent here, since the transfer in issue was not a sheriff's sale. We do note that, in each of the foregoing cases, the only property transferred was realty subject to a deed. Here, releases passed which effected at least part of the transfer as of October 3, 1984.[5] However, it seems logical to conclude that the entire transfer was not "made" until all aspects of it could be perfected, i.e., not until April 18, 1985.

There seems to be little question that, even under the balance-sheet test of insolvency, per the testimony of Mr. Remer, the Debtor was insolvent at all times after December 29, 1984, and therefore was of course insolvent as of April 18, 1985. The "equitable insolvency" test, which applies as to the Trustee's state law counts, is, if anything, easier to meet than the bankruptcy balance-sheet test. *See In re Fleet,* 89 B.R. 420, 424–25 (E.D.Pa.1988).

Hence, the transaction evidences only the fourth and the ninth of the potential eleven (11) badges of fraud. In light of absence of any proof of "actual fraud" on the part

---

4. This is the almost precisely the same status to which reference is made in 11 U.S.C. § 548(d)(1) as to when a transfer is deemed to be made for purposes of § 548(a), *i.e.,* when a bona fide purchaser from the debtor may enforce the obligation incurred.

5. A decision that the transfer did not occur on April 18, 1985, would also bar the Trustee's claim based upon § 548(a), since such an action must be brought within one year from the date of the transfer.

of the Debtor other than these two badges, we can rather safely dispose of any potential claims based upon 11 U.S.C. § 548(a)(1) or 39 P.S. § 357. *Compare Fleet, supra,* 89 B.R. at 427 (court declines to make a finding of "actual fraud" despite rather substantial evidence that several "badges of fraud" and fraudulent intention of the transferor were present).

### 4. THE TRUSTEE FAILED TO ESTABLISH THAT THE DEBTOR RECEIVED LESS THAN REASONABLY EQUIVALENT VALUE OR LESS THAN "FAIR CONSIDERATION" FOR THE PROPERTY TRANSFERRED.

Adequacy of consideration has frequently been an issue in the cases wherein we have held that transfers avoidable pursuant to § 548(a) were in issue. *See Fleet, supra,* 89 B.R. at 426–27; *In re Cole,* 81 B.R. 326, 328–30 (Bankr.E.D.Pa.1988); *In re Corbett,* 80 B.R. 32, 36–37 (Bankr.E.D. Pa.1987); and *Butler, supra,* 75 B.R. at 530–32. *Cf. Pinto, supra,* 89 B.R. at 499–500. However, in *Fleet* there was a considerable question whether the transferor-corporation received *anything* from the sole shareholder-transferee in an almost transparent insider-controlled transaction. The sheriff's sale cases, *Cole, Corbett,* and *Butler,* presented only the issue of whether the price received was adequate, which could be ascertained by the relatively objective means of comparing appraisals and estimates of fair market value and calculation of such mathematically ascertainable elements as the bid price and the debtor's equity lost in light of the sale.

Underlying our analysis of this issue here is the fact that the Trustee indisputably bears the burden of proving the issue of receipt of inadequate consideration by the transferor in the challenged transfer by a preponderance of the evidence. *See Pinto,* 89 B.R. at 499; and *Metro Shippers,* 78 B.R. at 750, 752–53. Some authority, contrary to *Pinto,* 89 B.R. at 501–02; and *Metro Shippers,* 78 B.R. at 750, suggests that, if the creditor or party attacking a transfer as fraudulent meets the burden of proving inadequacy of consideration, the

burden of defense of the transferee's solvency passes to the party seeking to uphold the transfer. *United States v. Gleneagles Investment Co.,* 565 F.Supp. 556, 577 (M.D. Pa.1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.), *cert. denied sub nom. McClellan Realty Co. v. United States,* — U.S. —, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); and *Baker v. Geist,* 457 Pa. 73, 78, 321 A.2d 634, 637 (1974). However, no authority of which we are aware ever has relieved the party attacking a fraudulent conveyance from carrying the burden of establishing that the transferee failed to receive fair or adequate consideration in the transfer.

If the transfer in issue had simply been, as the Trustee argues it was in substance, a transfer of the Debtor's stock, which its insolvency arguably rendered worthless at the time, to JEC in exchange for realty worth $250,000.00, the Trustee may well have succeeded. *See In re Roco Corp.,* 701 F.2d 978, 982–83 (1st Cir.1983); *In re Louisiana Industrial Coatings, Inc.,* 31 B.R. 688, 698 (Bankr. E.D.La.1983); and *In re DeFeo Fruit Co.,* 24 B.R. 220, 225 (Bankr. W.D.Mo.1982). However, in the transactions featured in each of those cases, the respective transferee-corporations received *only* their own worthless stock as purported consideration for the transfers. Moreover, the transfers in those cases did not even approach arms-length transactions. *Compare In re Corporate Jet Aviation, Inc.,* 57 B.R. 195, 197–99 (Bankr. N.D.Ga. 1986); and *In re Appomattox Agri–Service, Inc.,* 6 BCD 1239, 1241 (Bankr.W.D. Va.1980) (arms-length transactions wherein corporation redeemed stock ultimately determined to be worthless from minority shareholders held to be transactions in which sufficiently adequate consideration *was* paid).

However, here, the settlement-transaction obviously involved other transfers, on both sides. Most notably, JEC and the Pinto family gave up all of their claims in the suit brought in the C.P.Ct., the entire scope of which we cannot ascertain or measure in this record. They also gave up all of their considerable claims raised against

the Debtor raised in the PST lawsuit, and any other claims which they had against the Debtor. In addition, they gave up claims against Bono and the members of his faction.

Furthermore, the agreement left the Bono faction in charge of the Debtor. Knapp, as conservator of the Debtor, made it clear that he believed that instilling the Bono faction as management of the Debtor benefited it. Stabilization of management may, in itself, constitute some degree of consideration, and therefore it is an element to be given at least some weight. *See Maher v. Zapata Corp.,* 714 F.2d 436, 467 (5th Cir.1983); and *Milstein v. Werner,* 57 F.R.D. 515, 525 (S.D.N.Y.1972).

Of course, on the other hand, there was consideration other than the realty deeded to it which was received by JEC and the Pinto family in the transaction, including payments in an amount of amount $250,000 from the Debtor's profit-sharing plan, and their release from all of their obligations to the Debtor and to the Bono faction, including the $639,129.13 of accounts receivable allegedly owed to the Debtor by various members of the Pinto family, which appeared on the Debtor's books. .

The Trustee's principal argument concerning all elements of the bargain other than the realty and the Debtor's stock is that, except for perhaps Bob Pinto and the Pinto family members, no one placed any real value on the claims of the Pinto family other than nuisance value, and that the responsible catalysts of the settlement, *i.e.,* Cohen, Knapp, and Gallagher, considered the transaction to be, in substance, simply a transfer of the stock for the realty.

■ There is no question that the compromise of a dispute can supply the element of consideration in a contract. *See, e.g., North American Properties, Ltd. v. Pocono Farms Lot Owners Ass'n,* 489 F.Supp. 452, 458–59 (M.D.Pa.1980); *Shipley v. Pittsburgh & L.E.R. Co.,* 83 F.Supp. 722, 762 (W.D.Pa.1949); *Cohen v. Sabin,* 452 Pa. 447, 453–54, 307 A.2d 845, 849 (1973); and *Hensel v. Cahill,* 179 Pa.Super. 114, 118–19, 116 A.2d 99, 101 (1955). While it is true that a totally groundless claim or

a non-dispute may not constitute consideration, *Lombardo v. Gasparini Excavating Co.,* 385 Pa. 388, 391–92, 123 A.2d 663, 665 (1956); and *Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 285, 199 A. 139, 141 (1938), the courts will not look at the underlying merits of a compromise very critically to determine its worth. "The sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party. The very object of compromise is to avoid the risk or trouble of that question." *Shipley, supra,* 83 F.Supp. at 762. Furthermore, as the court states in *Maher, supra,* 714 F.2d at 455:

Settlements of shareholder derivative actions are particularly favored because such litigation is "notoriously difficult and unpredictable." *Schimmel v. Goldman,* 57 F.R.D. 481, 487 (S.D.N.Y.1973); *Republic National Life Insurance Company v. Beasley,* 73 F.R.D. 658, 667 (S.D.N.Y.1977); *Haudek, [The Settlement and Dismissal of Stockholders' Actions Part II: The Settlement* 23 SW.L.J. 765, 793 (1969) ]. The courts, therefore, do not lightly reject such settlements. *See Florida Trailer & Equipment Company v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960). Before approving the settlement of a shareholders' derivative action, however, the district court must determine that there has been no fraud or collusion in arriving at the settlement agreement, and that it is fair, reasonable, and adequate. *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971); *Miller v. Republic National Life Insurance Company,* 559 F.2d [426], ... 428–29 [5th Cir.1977].

■ We could hardly expect the Trustee to litigate, in this court, the so-called stockholders' derivative suit which the transfer in issue compromised in order that we could determine its merit. Likewise, we could not expect him to litigate the PST suit, or the legitimacy of the claims that the Pinto faction and the Bono faction had against one another *inter se* to determine their value.

However, we must note the presence of two factors which suggest that the settle-

ment was equitable, and thus that reasonably equivalent value or fair consideration was exchanged by each side to the settlement. First, the settlement was negotiated totally at arms-length. Secondly, all of the neutral participants involved in the matter strongly recommended it. Foremost among these parties was Cohen, who was the closest to the facts of the situation and trusted by both sides during the negotiations. The Trustee has not suggested that this trust was misplaced or that Cohen actually believed other than what he consistently expressed at that time and at trial, *i.e.*, that the settlement reached was fair. Also included in this group was Knapp, who believed, from his perspective as the highest order of a fiduciary of the Debtor as its conservator, that the settlement was advisable. Finally, Judge LaBrum placed the imprimatur of the C.P.Ct. upon the settlement. While Judge LaBrum obviously could not be expected to have fully weighed all factors relating to the various claims in deciding to approve the settlement, he obviously relied on the court-appointed conservator. The conservator, in turn, relied upon the fact that Cohen and all of the interested parties agreed on these terms. There is no suggestion that "fraud or collusion" played any role in the negotiation of the settlement. Hence, there is nothing the least bit extraordinary or objectionable about this process which should cause us to, effectively, overturn it.

We are therefore not prepared to say that either party to the settlement agreement received less than reasonably equivalent value or less than "fair consideration" for the promise of the other. To the contrary, given the confusing array of charges and counter-charges, we commend the parties in reaching as mutually-agreeable a settlement as they did. Again noting the arms-length nature of the negotiations, in contrast to many situations involving transfers to insiders, we are not prepared to look behind the C.P.Ct.'s approval of the settlement.

We therefore conclude that the Trustee has failed to meet his burden of proving that the Debtor failed to receive fair con-

sideration in the settlement, irrespective of the fact that, with hindsight, it appears that the Pinto faction gave up little, if anything, in relinquishing its interest in the Debtor in exchange for a portion of the Debtor's realty.

5. THE TRUSTEE'S FAILURE TO SUCCEED ON THE "FAIR CONSIDERATION" ISSUE PRECLUDES HIS RECOVERY ON EACH OF HIS "CONSTRUCTIVE FRAUD" THEORIES

As we indicated in our discussion at page 385 *supra*, the Trustee must succeed on the lack of "fair consideration" issue as well as the insolvency issue to succeed on his "constructive fraud" claims based upon 11 U.S.C. § 548(a)(2), or 39 P.S. §§ 354–56, or his claim under 15 P.S. § 1701 B(1)(i). Since he does not succeed on this issue, these claims, like his actual fraud claims which make up the balance of his claims, necessarily must fail.

F. CONCLUSION

Since none of the Trustee's alternative theories can succeed, our only recourse is entry of judgment in favor of the Defendant and against the Trustee.