**In re Douglas G. BRANTZ, Aleta Brantz, Debtors.**

**Bankruptcy No. 89–11791S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 2, 1989.

Jonathan H. Ganz, Philadelphia, Pa., for debtors.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

David E. Stern, Leona Mogavero, Blue Bell, Pa., for Meritor Financial Services, Inc.

James J. O'Connell, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

On June 16, 1989, the joint Debtors in this Chapter 13 bankruptcy case, DOUG-

LAS G. BRANTZ and ALETA BRANTZ (hereinafter "the Debtors"), commenced on May 25, 1989, filed a motion pursuant to 11 U.S.C. § 522(f)(1) seeking to avoid a judicial lien [1] in the amount of $28,441.17 obtained against their residential real estate at 2103 Friendship Street, Philadelphia, Pennsylvania 19149, held by Meritor Financial Services, Inc. (hereinafter "Meritor"). Meritor opposed the motion, principally by filing a motion seeking permission to institute an adversary proceeding to attack an apparently prior Mortgage in favor of Philip and Sondra Schley, the parents of the Wife–Debtor (hereinafter "the Schleys").

After two continuances of the Debtors' motion, we scheduled it for a hearing on a must-be-tried basis on September 14, 1989, per an Order of August 14, 1989. A Stipulation between Meritor and the Debtors to continue the hearing on the Debtors' motion until after Meritor's motion had been decided, brought to our attention after our Order of August 14, 1989, was entered, resulted in our also scheduling the hearing on Meritor's motion on September 14, 1989. The parties thoughtfully simplified the potential procedural logjam created by these motions and orders by appearing on September 14, 1989, and agreeing substantially as follows: (1) Meritor had standing and therefore could proceed to attack the Schleys' Mortgage. *Accord, In re Morrison,* 69 B.R. 586, 589–90 (Bankr.E.D.Pa. 1987); (2) Meritor's ability to defend the Debtors' motion depended entirely on its ability to avoid the Schleys' Mortgage; and (3) The parties were prepared to try the issue of whether Meritor could avoid the Schleys' Mortgage, pursuant to 11 U.S.C. §§ 547 or 548, on that date. Meritor then called Philip Schley and both Debtors as its witnesses as of cross-examination and adduced brief additional testimony from its work-out specialist assigned to the account, Michael Karp, in support of its position.

The Meritor judgment was based upon the Debtors' default in payments of a

---

**1.** This Code section provides as follows:

(f) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in a property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(1) A judicial lien; ...

Promissory Note of February 3, 1983, in the amount of $40,000, the proceeds of which were utilized in a business of the Husband–Debtor the failure of which had led to the Debtors' bankruptcy filing. In July, 1988, Mr. Karp met with the Husband–Debtor and Mr. Schley at the business to attempt to work out a resolution for curing the defaults in payment of the then-delinquent loan. On August 9, 1988, no resolution having been reached, Meritor's counsel wrote a letter to the business, copied to the Debtors and Mr. Karp, accelerating the indebtedness and indicating that a collection suit would be filed forthwith. On August 11, 1988, apparently having filed suit in the interim and having had a telephone conversation with the Husband–Debtor which Meritor's counsel believed had resulted in an agreement, counsel forwarded a draft of a Stipulation promising forbearance as long as the Debtor paid according to the terms set forth therein.

The Stipulation was never executed by the Debtors, and payments thereto were not made. Instead, on August 16, 1988, a Mortgage on the Debtors' home in favor of the Schleys in the amount of $40,000 was recorded. Meritor subsequently obtained a judgment against the Debtors, but this bankruptcy ensued before it could collect on same. However, the Schleys' Mortgage was prior to Meritor's subsequent judicial lien against the Debtor's home. The parties stipulated that the Debtors' home was worth $65,000 and was subject to other unavoidable mortgages in the total amount of $38,000. Whether the Debtors had any equity in the premises in excess of the $15,800 claimed exemptions in the premises, which have not been challenged,[2] was agreed to be dependent upon whether the Schleys' Mortgage could be avoided. *See*

*In re Magosin,* 75 B.R. 545, 547 (Bankr.E. D.Pa.1987).

Mr. Schley testified that he was very close to all of his five (5) children, including the Wife–Debtor[3] and very generous in assisting them financially. He stated that, since 1978, he had "made loans" to the Husband–Debtor's business, in a total amount of about $140,000. Repayments of $50 weekly were made on an irregular basis.

All of these "loans" were undocumented except by bank records showing withdrawals and deposits from the Schleys' bank accounts for about ten (10) years. However, Mr. Schley testified that he had open-heart surgery for the third time in January, 1988, at which time he was informed that a further heart attack would be fatal. Having no retirement benefits to protect his wife, he stated that he decided to ask the Debtors to sign the Mortgage to protect his wife's future financial security. The parties agreed on the $40,000 figure as their best estimate of the balance of the Debtors' present indebtedness to the Schleys, and a Mortgage was prepared and dated February 1, 1988. However, it was not recorded at that time because, according to Mr. Schley, he suffered another heart attack in March, 1988;[4] was hospitalized until May, 1988; was so sick thereafter that he had to have a cousin take it to City Hall to record it;[5] and this was not done until August, 1988. He claimed, despite his closeness to the Debtors, that he was unaware of the letters of August 9, 1988, and August 11, 1988, from Meritor's counsel which immediately preceded the filing of the Mortgage.

Mr. Schley also stated that he had loaned an additional $18,000 to the Debtors subsequent to August, 1988. While originally stating that he had loaned them $9,000 in

---

2. See page 68 & n. 9 *infra.*

3. However, his statement that they each call him three (3) times daily, which would result in at least fifteen (15) telephone calls from his children each day, appears to be one of several overstatements on his part.

4. Obviously, this was not fatal, as Mr. Schley stated that he had been informed in January,

1988, would be the case if he suffered another heart attack. This statement of his condition therefore appears to be another of his overstatements.

5. This appears to be another overstatement, as he had attended a meeting with Mr. Karp and the Husband–Debtor in July, 1988, in which the loan was discussed.

the past few weeks, he attempted to retract that statement when the court expressed concern that the Debtors had received an undisclosed post-petition loan from him. Mr. Schley also contended that the Debtors have continued to date to repay him $50 weekly on the $40,000 indebtedness reflected by the Mortgage. He attempted to retract this statement in part by claiming that his wife made part of the $50 payments for the Debtors when the court expressed a concern that potentially-avoidable post-petition payments were being made to him. These attempted retractions weighed against his credibility, as did his overstatements.

The Husband–Debtor's testimony was marked by his "inability to recall" the dates of any significant events, including those of his post-petition loans from and payments to his parents-in-law or that of his signing of the Schleys' Mortgage. He did recall the letters from Meritor's counsel. However, apparently perceiving the need to place the signing of the Mortgage before receipt of the letters to legitimize his actions, he stated that the signing occurred in "spring, 1988." He also conceded that his liabilities exceeded his assets by $60,000 to $70,000 as of August, 1988. The

Wife–Debtor, agreeing with her husband's statement of the couple's asset-picture, but disagreeing with her husband regarding the date of the signing of the Mortgage, placed the signing in August, 1988, just before the recordation of the Mortgage.

At the close of the testimony, we engaged in an extended colloquy with counsel. Meritor first asserted that the transfer could be avoided pursuant to 11 U.S.C. § 547. We opined that the elements of §§ 547(b)(1), (b)(2), (b)(3), and (b)(4)(B) were clearly present.[6] Meritor was permitted to reopen the record to admit a copy of the Debtors' proposed Chapter 13 Plan, contemplating a ten (10%) percent dividend to unsecured creditors, thereby clearly satisfying the element of § 547(b)(5). In response, the Debtors asserted a § 547(c)(4) affirmative defense in the amount of $18,000, arising from Mr. Schley's alleged advances to the Debtors after the execution of the Mortgage.

Meritor also relied on both 11 U.S.C. § 548(a)(1) (transfer characterized by actual fraudulent intent) and 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i) (transfer which is a constructive fraud) as bases for avoidance of the Schleys' Mortgage.[7] The

---

6. The pertinent Code Sections, 11 U.S.C. §§ 547(b) and 547(c)(4) provide as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under Chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
(c) The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

7. These Code Sections provide as follows:
(a) the trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was

Debtors argued that the Schleys had received consideration for the transfers in the form of the extensive prior loans and that there were insufficient "badges of fraud" present in the transaction, *see In re Pinto Trucking Service, Inc.*, 93 B.R. 379, 386 (Bankr.E.D.Pa.1988), to offset their denials of fraudulent intent.

Meritor's counsel also argued that a mortgage, like the Schleys' Mortgage, which lies unaccompanied by another writing evidencing the underlying debt secured by it was invalid. At its request, we allowed it (and the Debtors as well) until September 20, 1989, to submit any writings to us in the form of post-hearing argument, particularly on this latter point, which was unfamiliar to us. The sum total of the responses was a one-page letter of September 19, 1989, from Meritor's counsel, arguing that the Schleys' lack of compliance with Act 6 of 1974, 41 P.S. § 101, *et seq.* (hereinafter "Act 6"), and the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* (hereinafter "TILA"), justified striking the Mortgage. This is a curious and totally spurious argument.[8]

Our decision flows directly from our conclusion that the recording of the Schleys' Mortgage was a calculated, direct, and immediate response to one predominant external factor: Meritor's threat to sue the Debtors on its Note. We refuse to find it purely coincidental that a Mortgage, in the same amount as Meritor's Note, would be recorded by the Schleys a few days after Meritor's demands.

Mr. Schley, given his obvious overstatements, see page 64, nn. 3, 4, 5 *supra*, was not generally a credible witness. His testimony had the distinct air of a parent quite willing to bend the truth to "help" his

daughter and her husband. His meeting with Karp to discuss the status of the Meritor loan in July, 1988, belies his contention that he was so ill between January, 1988, and August, 1988, that his intention to record the Mortgage, allegedly formulated in February, 1988, was put off and that the Debtors did not inform him of their troubled circumstances due to his illness during this period. If his explanation for desiring a mortgage from the Debtors to protect his wife in light of his own failing health had in fact been a dominant motive for recording the Mortgage, his subsequent hospitalization in March, 1988, would have caused him to have the Mortgage recorded immediately, not later.

The variance in the testimony of Mr. Schley and each of the Debtors as to when the Mortgage was executed is indicative of the attempt by particularly Mr. Schley and the Husband–Debtor to introduce fabrications to conceal the true motivations of the Debtors and the Schleys for the entry of the Mortgage at the time when it was effected. The Wife–Debtor, we believe honestly, testified that the Mortgage was executed in August, 1988, probably just before it was recorded. The February date appears to have been added to the Mortgage, possibly cleverly typed onto the document in August, as an attempt to conceal the true motivations of the parties. Mr. Schley, never stating when the document was executed, claimed unlikely ignorance of Meritor's August demands. The Husband–Debtor, unable to deny knowledge of the August letters, attempted to feign ignorance of the date of signing and then improbably place it in spring, long before his wife definitely stated that the Debtors had signed the Mortgage.

---

incurred, or became insolvent as a result of such transfer or obligation; ...

8. No authority is cited for this proposition, although, in the letter, counsel states as follows: "It is my understanding that this court has held that a mortgage may be stricken for failure to comply with the requirements of Act 6." We know of no such case. Act 6 does incorporate the TILA disclosure requirements. 41 P.S. § 401. However, disclosures under TILA are required to be made only by "creditors," 15 U.S.C. § 1638(a), and there is no evidence that

the Schleys "regularly" extend credit and hence meet this definition. *See* 15 U.S.C. § 1602(f). Perhaps Meritor's counsel is referencing our quite distinct holding in *In re Mosley*, 85 B.R. 942, 951–55 & n. 7 (Bankr.E.D.Pa.1988), that a significant violation of Act 6 may invalidate a foreclosure judgment and claims for fees and costs incurred in obtaining such a judgment. However, these principles have no applicability here, as the Schleys are not asserting any rights based upon a judgment.

We believe that, first and foremost, the Schleys' Mortgage may be avoided pursuant to 11 U.S.C. § 548(a)(1). We disbelieve the testimony of Mr. Schley and the Husband–Debtor and find that the predominant and perhaps the sole motivation of the Debtors and the Schleys which resulted in the preparation and recording of the Mortgage was the actual intent of these parties to hinder, delay, and defraud Meritor by attempting to pre-empt the maximum amount of the Debtor's obligation to it with the Schleys' Mortgage.

In *Pinto Trucking, supra,* 93 B.R. at 386, we acknowledged

the well-developed list [of "badges of fraud"] set forth in § 4(b) of the proposed Uniform Fraudulent Transfers Act (hereinafter "UFTA"), which reads as follows:

"(b) In determining actual intent ..., consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lien- or who transferred the assets to an insider of the debtor."

7A UNIFORM LAWS ANNOTATED 653 (1965). *See also, e.g., In re Crompton,* 70 B.R. 60, 62 (Bankr.W.D.Pa.1987).

"Badges of fraud" (1), (2), (4), (5), (9), and (10) from the list above clearly are present here. We also believe that "badge" (8), lack of reasonably-equivalent consideration for the transfer, was present. While we believe that the Schleys did advance sums to the Debtors prior to August, 1988, which may have exceeded a net balance of $40,-000, there is no indication that granting a Mortgage on their home in favor of the Schleys was a condition for these transfers at the time that they were made nor was there an indication of any substantial additional advance in 1988 which justified execution of the Mortgage. Previous loans could hardly be consideration for subsequently granting a lender security.

Other "badges," not included in the list above, are present here. One is the amount of the Mortgage, which is the exact equivalent of Meritor's Note. Another is the timing of the recording of the Mortgage, just after Meritor's threats and demands. The final "badge" is the rather apparent web of falsehoods spun by the Debtors and Mr. Schley at the hearing to attempt to defend this transaction. *Compare In re Fleet,* 89 B.R. 420, 427 (E.D.Pa. 1988) (general lack of credibility of transferor supports avoidance of a transfer on the basis of fraudulent intent).

This conclusion makes consideration of whether the Mortgage could be avoided under 11 U.S.C. §§ 548(a)(2)(A) and (a)(2)(B)(i) and 11 U.S.C. § 547 superfluous. However, we observe that proving (1) lack of receipt of equivalent value; and (2) insolvency, both of which we found present in considering the presence of certain "badges" of fraud in the foregoing discussion is in itself sufficient to allow Meritor to avoid the Mortgage as a constructive fraud.

With respect to the Debtors' only viable defense to the § 547 claim under § 547(c)(4), *i.e.,* that the Schleys gave new

value of $18,000 after the Mortgage, thereby preventing avoidance of $18,000 of the Mortgage, we question whether such a defense is viable when it is apparent that the giving of new value had no connection with the transfer. We find that, in advancing the $18,000, the Schleys were acting precisely as they had for the previous eleven (11) years, and that the presence of the Mortgage was not a factor in their continued beneficence towards the Debtors. However, such analysis of the motives for the giving of new value may be inappropriate. *See In re New York City Shoes, Inc.,* 880 F.2d 679, 680–81, 684–85 (3d Cir.1989) (§ 547(c)(4) has only three (3) requirements: (1) an otherwise voidable transfer; (2) an advance of new unsecured creditor after the transfer; and (3) the creditor must not have been fully compensated for the new value. None of these requirements implicate the creditor's subjective state in providing the new value. Hence, the motivations of the creditor in giving the new value may be irrelevant).

■ We therefore conclude that the Schleys' Mortgage may be and hereby is avoided. However, this conclusion does not, as Meritor apparently assumed, result in total denial of the Debtors' motions. Rather, it merely results in exclusion of the Schleys' Mortgage in applying the formula for § 522(f)(1) lien avoidance set forth as follows in *Magosin, supra,* 75 B.R. at 547:

1. Determine the value of the property on which a judicial lien is sought to be avoided.

2. Deduct the amount of all liens not to be avoided from (1).

3. Deduct the Debtors' allowable exemptions from (2).

4. Avoidance of all judicial liens results unless (3) is a positive figure.

5. If (3) does result in a positive figure, do not allow avoidance of liens, in order of priority, *to that extent only* (emphasis added).

The parties stipulated that the value of the Debtors' home was $65,000. They also agreed that the mortgages other than that of the Schleys, totalling $38,000, could not be avoided. The claimed exemptions of the Debtors in their home totalling $15,800 have not been challenged.[9] Therefore, it appears that the Debtors are precluded from avoiding only $12,200 of the Meritor lien on the basis of the following calculations pursuant to the *Magosin* formula:

| | |
|---|---|
| Value of Property: | $65,000 |
| Unavoidable liens: | (38,000) |
| Exemptions: | (15,800) |
| Amount which cannot be avoided | $12,200 |

Since Meritor's lien is $28,441.17, more than $16,200 of Meritor's lien *is* avoidable.

Finally, we must observe that this hearing has yielded information of which the Trustee should take note. The Debtors have admitted making certain post-petition loans without permission from this court, which may be subject to investigation. *See* 11 U.S.C. § 364 (only Trustee may obtain credit post-petition). The proceeds from these loans may also constitute undisclosed income. Also, they have admitted making certain post-petition loan repayments to the Schleys, which are apparently subject to avoidance. *See* 11 U.S.C. § 549(a). The

---

**9.** We believe that a creditor opposing a § 522(f)(1) motion may dispute the validity of exemptions claimed by the debtor despite having failed to raise a timely objection to the exemptions themselves pursuant to Bankruptcy Rule 4003(b). *See In re Montgomery,* 80 B.R. 385, 387–93 (Bankr.W.D.Tex.1987); *In re Mitchell,* 80 B.R. 372, 374–80 (Bankr.W.D.Tex.1987); and *In re Brockington,* Bankr. No. 87–02559S (Bankr.E.D.Pa. Jan. 12, 1988). *But see Magosin, supra,* 75 B.R. at 548–49. *Cf. In re Frazier,* 104 B.R. 255 (Bankr.N.D.Cal.1989); and *In re Roehrig,* 36 B.R. 505, 507–08 (Bankr.W.D.Ky.1983) (failure to object to claim of exemptions does not affect creditor's ability to defend a motion under 11 U.S.C. § 522(f)(2)). *But cf. In re Van*

*Pelt,* 83 B.R. 617, 618–19 (Bankr.S.D. Iowa 1987); *In re Hahn,* 60 B.R. 69, 75–76 (Bankr.D. Minn.1985); and *In re Grethen,* 14 B.R. 221, 225–26 (Bankr.N.D. Iowa 1981). We also observe that the Debtors have apparently claimed more exemptions than those to which they were entitled pursuant to 11 U.S.C. § 522(d)(5) (each debtor may use only the extra $400 exemption since the homestead exemption was used; however, the $400 sum is claimed in the home and also for tax refunds and deposits). However, Meritor has not raised any such contentions, even in its defense of this motion at the hearing and we will therefore not consider these matters.

first meeting of creditors pursuant to 11 U.S.C. § 341 has already apparently taken place on August 23, 1989. The Standing Chapter 13 Trustee or the United States Trustee should consider convening a special meeting of creditors, *see* 2 COLLIER ON BANKRUPTCY, ¶ 341.03, at 341–13 (15th ed. 1989), or an examination of the Debtors pursuant to B.Rule 2004 for the purpose of effecting further investigation of these matters.

An Order consistent with the conclusions expressed in this Opinion will be entered.

## ORDER

AND NOW, this 2nd day of October, 1989, after a hearing of September 14, 1989, on the Debtors' Motion to avoid the judicial lien of Meritor Financial Services, Inc. (hereinafter "Meritor") against the Debtors' premises at 2103 Friendship Street, Philadelphia, Pennsylvania 19149 (hereinafter "the Premises"), at which the parties agreed that Meritor could challenge the prior mortgage of Philip and Sondra Schley (hereinafter "the Schleys"), it is hereby ORDERED as follows:

1. Meritor's motion to avoid the mortgage of the Schleys of August 16, 1988, against the Premises pursuant to 11 U.S.C. §§ 548(a)(1), 548(a)(2)(A), and 548(a)(2)(B)(i) is GRANTED and the aforesaid mortgage is declared null and void. The Schleys are directed to take all steps necessary to satisfy this mortgage on or before October 16, 1989.

2. The Debtors' Motion to avoid Meritor's judicial lien obtained in an action in the Philadelphia County Court of Common Pleas, August Term, 1988, No. 1615, in the amount of $28,441.17, is GRANTED in part, the said lien is reduced to the amount of $12,200. Meritor is directed to take all steps necessary to reflect this Order on or before October 16, 1989.

3. The Standing Chapter 13 Trustee or the United States Trustee is directed to carefully review this Opinion and to consider scheduling a special meeting of creditors or an examination of the Debtors forthwith.